[Nos. 14372-1-II; 15215-1-II. Division Two. August 26, 1992.]

THE STATE OF WASHINGTON, *Respondent,* v. MARVIN L. CLAPP, *Appellant.*

*Mark W. Muenster,* for appellant (appointed counsel for appeal).

*Arthur D. Curtis, Prosecuting Attorney,* and *Michael C. Kinnie, Deputy,* for respondent.

SEINFELD, J. — Marvin Clapp was convicted by a jury of two counts of solicitation of murder in the first degree and one count of solicitation of arson in the first degree. He appeals the conviction, the sentence, and the trial court's order requiring him to pay restitution to one of the arson victims. We find no error and affirm the convictions and the sentence as well as the order of restitution.

In 1981 Marvin Clapp purchased the right to distribute the Portland *Oregonian* newspaper in the Vancouver area. Due to the *Oregonian*'s reorganization of its distribution system, Clapp lost his distributorship 2 years later. Clapp resented the change, and particularly directed his anger at Robert Gillard and Pat Marlton, managers of the circulation department. He filed two unsuccessful lawsuits against the *Oregonian* and against the two employees, one in Oregon state court, the other in federal court. The lawsuits contained allegations of "corporate blackballing" and slander; Clapp claimed that he lost his business and his house as a result of the *Oregonian*'s unfair conduct. The Oregon circuit court dismissed Clapp's claim on summary judgment in January 1986. Clapp appealed and the order was affirmed sometime in 1987. Meanwhile Clapp initiated the federal litigation in 1988. The Federal District Court dismissed that matter also on summary judgment in July 1989. Clapp appealed to the Ninth Circuit Court of Appeals. On August 2, 1989, while the appeal was pending, Clapp's attorney wrote to the *Oregonian* seeking to obtain a settlement. On December 19, 1989, Clapp voluntarily withdrew his federal appeal.

During this time, Clapp became acquainted with Billy Ray Robinson, who had moved into Clapp's neighborhood in Vancouver. Robinson had an extensive criminal record (including three convictions for armed robbery) and had spent the last 10 years in and out of prison in California. The two men began to confide in each other and Clapp told Robinson about his problems with the *Oregonian* and his anger toward Gillard and Marlton.

In July of 1989, Clapp approached Robinson with the idea of doing drive-by shootings at Gillard's and Marlton's homes. Clapp hoped that the shootings would cause the *Oregonian* to agree to a financial settlement of the pending appeal. Clapp offered Robinson $300 to do the shootings, provided him with a shotgun and shells, drove with him a number of times to the victims' neighborhoods, and paid Robinson $100 up front.

On August 20, 1989, Gillard was awakened at approximately 2 a.m. and discovered that someone had shot a hole in his living room window. Gillard told the police that Clapp was the only person he could think of who would be angry enough to do such a thing. That same night Patrick Marlton was awakened by a noise that he thought was firecrackers exploding. The next morning he noticed that there had been a shot fired through his front window. He also told the police that he thought Clapp might be responsible.

The shootings failed to generate the settlement offer Clapp hoped for and a month or so later he asked Robinson to firebomb Marlton's home in exchange for $700. Robinson agreed, and the bombing was scheduled for Halloween night. The bombing did not go as planned, however, because the transmission gave out on the car that Clapp loaned to Robinson, and the two agreed to try the bombing again at a later date.

In the meantime, Clapp began to talk to Robinson about killing Gillard and/or Marlton. Clapp promised to pay Robinson $5,000 to kill one or the other, or both. According to Robinson, the men first discussed killing "both of them, one or the other. It didn't really matter as long as somebody got killed." Later on, Clapp "asked again . . . how would you like to make $5,000 to kill these people. If these people didn't settle his lawsuit . . . [Clapp] would kill them. If [Robinson] wouldn't do it, [Clapp] would." Clapp instructed Robinson "to stalk them and get their movements and see how they went to work and came back and get their routine and either drive by and get them with the shotgun or snipe them. Snipe them with a high powered rifle."

In the early morning hours of January 8, 1990, Robinson threw a "Molotov cocktail" through Marlton's dining room window. Marlton awoke, discovered the fire and was able to confine the blaze to the dining room area, although the fire caused extensive damage to Marlton's home. A few days after the firebombing incident, Robinson called Marlton, and, after asking for "immunity", he confessed to both the shooting and the firebombing. Robinson also told Marlton that he had a contract to kill him.

A few hours after the phone call, police officers from Portland came to Robinson's house and took his statement, but did not arrest him. Instead, the police arranged for Robinson to wear a wire and talk to Clapp about the plan to kill Marlton and Gillard. The following day, a conversation between Robinson and Clapp was recorded. After hearing the tape, the police took Clapp into custody and he was eventually charged with criminal solicitation to commit murder in the first degree (RCW 9A.28.030(1) and RCW 9A.32.030) for offering and giving money to Robinson, during the period of August 1989 through January 17, 1990. The information charged two separate counts of solicitation, one for Robert Gillard and one for Patrick Marlton. Clapp was also charged with a third count, criminal solicitation to commit arson in the first degree (RCW 9A.28.030(1) and RCW 9A.48.020) for the firebombing of Marlton's home. The case proceeded to trial, with Billy Ray Robinson acting as the State's chief witness. During the trial, over defense objections, the taped conversation between Robinson and Clapp was played two times. It was also played once during deliberations. The jury was also provided with a written transcript of the tape.

At the close of the State's case, the defense moved to dismiss. It argued that the State had shown that money was exchanged for a drive-by shooting, but had not established defendant's intent to kill. The judge denied the motion, reasoning that the conversations, in which Clapp offered Robinson $5,000 to kill one or the other or both of the men,

constituted sufficient evidence of the elements of the crime of solicitation of first degree murder.

At the same time, the defense asked the trial court to require the State to specify the particular incident on which it relied to prove the solicitation charges. The court refused to do so, stating that "it is a continuing course of conduct if you believe the evidence, and it does extend from August of 1989 into January of 1990." The trial court noted that the jury would be instructed that it would have to agree upon a particular act in order to find Marvin Clapp guilty of solicitation of murder, and the jury was so instructed.

In closing argument the prosecutor acknowledged that the State's entire case depended on Billy Ray Robinson. He also told the jury that the State had agreed not to prosecute Robinson in exchange for Robinson's *truthful* testimony in this matter. Clapp made no objection to this characterization of Robinson's testimony.

The jury convicted Clapp on all three counts and the judge sentenced him to 252 months on each of the murder solicitation charges and 35 months on the arson solicitation charge; the sentences are to run concurrently. At the sentencing hearing, the defense moved to merge count 3 (solicitation of arson) into count 2 (solicitation of murder of Marlton) and to merge count 2 into count 1 (the two solicitation of murder charges). The motions were denied.

Six months after sentencing, a restitution hearing was held. The trial judge found that the loss to Marlton from the firebombing was $22,269. Clapp asked the court to deny or reduce the amount of restitution, arguing that the amount of damage was not foreseeable, and that because Robinson was jointly responsible, Clapp should not be required to pay for the total loss. The trial court disagreed and ordered that Clapp pay restitution in the amount of $22,269. Clapp now appeals the convictions, the sentencing and the restitution order.

Clapp first contends that there is insufficient evidence to support convictions of two separate counts of solicitation of

murder in the first degree. Our review of the trial court proceedings, however, shows no error.

▮ Evidence is sufficient to support a guilty verdict in a criminal case if, after viewing the evidence in the light most favorable to the State, this court determines that a rational trier of fact could have found all of the elements of the crime charged beyond a reasonable doubt. *State v. Green*, 94 Wn.2d 216, 221, 616 P.2d 628 (1980). A person is guilty of criminal solicitation when "with intent to promote or facilitate the commission of a crime, he offers to give or gives money . . . to another to engage in specific conduct which would constitute such crime or which would establish complicity of such other person in its commission or attempted commission had such crime been attempted or committed." RCW 9A.28.030. The specific conduct in this case is murder in the first degree, which requires "a premeditated intent to cause the death of another person . . . ". RCW 9A.32.030.

Here, a reasonable trier of fact could have found that Clapp offered Robinson money to cause the death of either or both victims. Robinson's testimony is that he and Clapp discussed killing "them" and that Clapp asked Robinson whether he wanted to make $5,000 to kill "these" people. The jury was entitled to find that Clapp solicited Robinson for the murder of one man or the other or, as it ultimately found, for the murder of both men. The convictions are supported by sufficient evidence.

Clapp next contends that the trial court erred when it failed to require the State to specify the exact time frame and incidents upon which it relied to support the two solicitation charges. He argues that the lack of specificity violated his right to a unanimous verdict. The jury was specifically instructed that "all twelve of you must agree beyond a reasonable doubt on the same underlying act in order to convict." Nonetheless, Clapp argues that due to the extended time frame, the jury might have based its decision on an underlying event (such as the agreement to do the drive-by shootings or the agreement to firebomb) that alone would not support a conviction of solicitation of first degree murder.

Consequently, he maintains, this court cannot determine if a unanimous jury decided that the criminal act charged in the information had been committed. *See State v. Petrich*, 101 Wn.2d 566, 569, 683 P.2d 173 (1984) (defendant has right to a unanimous jury verdict; all jurors must agree that the criminal act charged in the information has been committed; requirement is satisfied by instruction to jurors that they must agree on the underlying criminal act which supports the conviction). Again, we find no error.

The trial court instructed the jury regarding the elements required to convict Clapp of solicitation to murder Gillard or Marlton and advised it that it must find "that *during August, 1989, through January 17, 1990,* the defendant gave or offered to give money to another to engage in specific conduct . . . with the intent to promote or facilitate the commission of the crime of Murder in the First Degree . . .". (Italics ours.) The jury also was instructed as to the elements of murder in the first degree. Finally, the jury was specifically told that it must unanimously agree on an underlying act in order to convict Clapp of solicitation of murder in the first degree. Clapp did not take exception to any of these instructions.

■ We are convinced that these instructions protected the defendant's right to jury unanimity. The trial court would have erred had it not informed the jury that it must agree on one underlying act within the time frame given. *State v. Petrich, supra.* Furthermore, there is no indication that the verdict was not unanimous. The law is well settled that jury instructions are sufficient if, when read as a whole, they allow counsel to argue his or her theory of the case, are not misleading and properly inform the trier of fact of the applicable law. *State v. Mark*, 94 Wn.2d 520, 618 P.2d 73 (1980). The jury in this case was informed of the elements of first degree murder, it knew that it needed to find all of those elements in order to convict Clapp and it knew that it must agree as to which incident supported the conviction. Nothing prevented Clapp from arguing his theory to the jury — that the firebombing or the drive-by

shooting incidents were insufficient to support a conviction for solicitation of murder in the first degree. Consequently, the trial court did not err when it instructed the jury, nor did the court err when it refused to require the State to specify a particular time or incident to support the charge of solicitation of murder in the first degree.

Clapp next contends that the trial court abused its discretion when it allowed the jury to hear the body wire tape several times while following along on the written transcript of the taped conversation. On this issue, Clapp argues that the judge violated the best evidence rule when he allowed the transcript to be considered in addition to the tape itself, and that the court overemphasized one piece of evidence when it allowed the tape to be played twice during the trial and once more during deliberations. We have reviewed the tape and the transcript and we find no error.

■ Generally, the admission or refusal of evidence lies within the sound discretion of the trial court and will not be reversed on appeal absent a showing of abuse of discretion. *State v. Stubsjoen*, 48 Wn. App. 139, 147, 738 P.2d 306 (citing *State v. Laureano*, 101 Wn.2d 745, 764, 682 P.2d 889 (1984)), *review denied*, 108 Wn.2d 1033 (1987). The reviewing court finds an abuse of discretion only where no reasonable person would take the position adopted by the trial court. *State v. Huelett*, 92 Wn.2d 967, 969, 603 P.2d 1258 (1979). Audiotapes, like other relevant evidence, are admissible at the discretion of the trial court, but should be excluded if they are unduly prejudicial. *State v. Frazier*, 99 Wn.2d 180, 661 P.2d 126 (1983).

■ ER 1002, the best evidence rule, states that, generally, the original writing, recording, or photograph is required to prove its contents. Commentators have noted that a duplicate may qualify as an original, but a written transcript does not qualify as a duplicate of an electronic recording. *See* 5B K. Tegland, Wash. Prac., *Evidence* § 482 (3d ed. 1989). However, Tegland also notes that

a typewritten transcript may be given to the jury to "illustrate" evidence contained on a tape recording. A transcript can

> be a helpful listening aid, particularly when portions of the tape are nearly inaudible. The transcript is not offered into evidence to prove the contents of the tape, and thus is not barred by the best evidence rule. The party offering the transcript must make a foundation showing of its accuracy. The court has broad discretion to allow or disallow transcripts and other listening aids.

5B K. Tegland § 483(3). *See State v. Frazier, supra* (trial court has discretion to admit both a tape and a transcript as exhibits).

Here, Clapp attempts to distinguish Tegland and *Frazier*, arguing that the best evidence rule bars the use of the transcript in this case because the accuracy of the transcript is in dispute. We see no reason to depart from Tegland's reasoning. The State provided a foundation to establish the accuracy of the transcript; witnesses testified that they had listened to the tape and created the transcript and Robinson testified that the transcript was an accurate illustration of the taped conversation. Moreover, even when the prosecutor questioned Clapp while referring to the transcript rather than to the tape, the judge made clear to the jury that the transcript was not the evidence and should not be considered evidence. There was no violation of the best evidence rule.

■ Nor did the trial court abuse its discretion by allowing the jury to hear the tape more than once or to listen while following along with a transcript. Our Supreme Court's holding in *Frazier* is dispositive. The court noted that the rule in Washington is that

> a tape recorded statement of the defendant and a properly authenticated transcript thereof may, within the sound discretion of the trial court, be admitted as exhibits and reviewed by the jury during its deliberations. . . .

*Frazier*, 99 Wn.2d at 188. The *Frazier* court went on to hold that exhibits such as tapes and transcripts do not violate the rule against undue repetition so long as the trial court finds, in its discretion, that the exhibits bear directly on the charge and are not unduly prejudicial. *Frazier*, 99 Wn.2d at 189.

It is clear from our review of the record of this case that each time the tapes were played or the transcript was used, the judge admonished the jury as to the limited purpose of the transcript. The judge scrupulously controlled the jury's access to the tape. He did not allow the tape or the transcripts to be taken into the jury room, did not give the jury access to a tape recorder, and only allowed the jury to hear the 7-minute tape three times, each time in open court. The judge carefully considered the possibility of prejudice and guarded against it. There was no abuse of discretion and we decline to distinguish *Frazier. Cf. State v. Ross*, 42 Wn. App. 806, 714 P.2d 703 (1986) (abuse of discretion occurred when trial court allowed jury unlimited and unsupervised access to tape and tape player).

Clapp next asserts that the prosecutor's closing argument, in which the jury was told Robinson escaped prosecution in exchange for his truthful testimony, constitutes prosecutorial misconduct and reversible error. To sustain a prosecutorial misconduct claim, however, the defendant must show both misconduct and resulting prejudice. *State v. Smith*, 104 Wn.2d 497, 707 P.2d 1306 (1985). When counsel does no more than argue facts in evidence and suggest reasonable inferences from that evidence, there is no misconduct. *Smith*, 104 Wn.2d at 510. In this case, counsel for the State simply pointed out facts that were already in evidence and made an argument based on those facts.[1] The prosecutor did not give his personal opinion as to Robinson's veracity as a witness. We do not find misconduct.

Clapp also advances the notion that his right to be free from double jeopardy, which includes a prohibition against being punished twice for the same crime, was violated when he was convicted of both counts of solicitation of murder in the first degree. There is, however, sufficient evidence on the record to support convictions for solicitation to kill *both* men. Consequently, Clapp is being punished for two separate crimes and there is no double jeopardy viola-

---

[1] When he took the stand Robinson acknowledged that he was testifying in exchange for favorable treatment.

tion. *See State v. Roybal*, 82 Wn.2d 577, 512 P.2d 718 (1973) (defendant is put in double jeopardy only if he or she is punished separately for two or more offenses that are identical "both in fact and law").

Clapp also contends that the two separate convictions for solicitation of murder in the first degree should have merged at the sentencing phase of his case. Again, we are satisfied that there was no error.

Even after the adoption of the Sentencing Reform Act of 1981, the rule in Washington remains that an additional conviction "cannot be allowed to stand unless it involves some injury to the person or property of the victim or others, which is separate and distinct from and not merely incidental to the crime of which it forms an element." *State v. Johnson*, 92 Wn.2d 671, 680, 600 P.2d 1249 (1979), *cert. dismissed*, 446 U.S. 948, 64 L. Ed. 2d 819, 100 S. Ct. 2179 (1980). Such is not the case here. The State charged two distinct crimes against two separate victims. One crime of solicitation of murder does not merely form an element of the other crime of solicitation of murder; separate punishment for each conviction is not precluded. In addition, "[c]rimes against different victims clearly seem to satisfy *Johnson*'s 'independent purpose or effect' test." *State v. Hudlow*, 36 Wn. App. 630, 633, 676 P.2d 553 (1984).

Next, Clapp argues that count 2 (solicitation to kill Marlton) should have merged with count 3 (solicitation to commit arson by causing a fire at Marlton's home). His theory here is that, given the manner in which the court instructed the jury, the jury could have found that the solicitation of the firebombing proved the solicitation of the murder; thus, there was but one solicitation and the arson solicitation should have merged into the murder solicitation. After considering this argument, we are satisfied that the trial court did not err when it failed to merge these convictions.

The jury heard evidence of two separate solicitations, one for the firebombing and one for the murder for $5,000 (the murder was to be committed with a gun, not by arson). There were two separate crimes charged, and the evidence

entitled the jury to convict Clapp of two separate solicitations. One did not necessarily prove the other and the judge did not err by failing to merge the convictions. *See State v. Johnson, supra.*

Finally, Clapp contests the outcome of the restitution hearing that followed his conviction. He argues that the trial court erred when it determined that he was responsible for the entire amount of restitution required to repair the fire damage to Marlton's home. We review a trial court's restitution order for abuse of discretion. *State v. Young,* 63 Wn. App. 324, 818 P.2d 1375 (1991). We find no such abuse and affirm the order of restitution.

Clapp maintains that he should not be responsible for the damages from the fire because he did not actually carry out the crime. We reject this argument. Restitution is appropriate if the ultimate damages are foreseeable to the defendant and the trial court finds a causal connection between the crime proved and the injuries for which compensation is made. *State v. Steward,* 52 Wn. App. 413, 760 P.2d 939 (1988); *State v. Hartwell,* 38 Wn. App. 135, 139, 684 P.2d 778 (1984). Here, the damages to Marlton's home were certainly a foreseeable result of the crime of solicitation of arson. Similarly, there is a clear causal connection between an agreement to firebomb somebody's home and the damages which result, regardless of who actually sets the fire.

Clapp also advances the theory that the assessment of restitution against him alone violates his right to contribution from Robinson. Again, we disagree. RCW 9.94A.142(4) states that the restitution statute "does not limit civil remedies or defenses available to the victim, survivors of the victim, or defendant." Clapp is free to seek contribution from Robinson in a separate proceeding.

Lastly, RCW 9.94A.142(2) gives the trial court the discretion to refuse to order restitution in "extraordinary circumstances . . . which make restitution inappropriate . . .". Here, Clapp contended that the fact that Robinson was not punished for his involvement should be viewed as an extra-

ordinary circumstance. After carefully considering the situation, the trial court refused to find extraordinary circumstances. We cannot say that an abuse of discretion occurred.

The convictions, sentence and the order of restitution are affirmed.

MORGAN, A.C.J., and ALEXANDER, J., concur.

Review denied at 121 Wn.2d 1020 (1993).