# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 07-2533

_____

|  |  |  |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Northern District of Iowa. |
| James Howard Bentley, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted: February 12, 2008
Filed: April 8, 2009

_____

Before WOLLMAN, JOHN R. GIBSON, and SHEPHERD, Circuit Judges.

_____

JOHN R. GIBSON, Circuit Judge.

James Howard Bentley was sentenced to 1200 months' incarceration after being convicted by a jury of six counts relating to child pornography: two counts of sexual exploitation of a child under 18 U.S.C. § 2251(a) and (c); two counts of possession of child pornography under 18 U.S.C. § 2252A(a)(5)(B) and (b)(2); and two counts of interstate transportation of child pornography under 18 U.S.C. § 2252A(a)(1) and (b)(1). He appeals his conviction on three grounds: (1) the district court[1] limited his cross-examination of government witnesses in violation of his Sixth Amendment

_____

[1]The Honorable Linda R. Reade, Chief Judge, United States District Court for the Northern District of Iowa.

rights; (2) the prosecution engaged in misconduct during trial; and (3) the testimony of two trial witnesses should have been excluded under Federal Rule of Evidence 403. We affirm.

## I.

Bentley regularly babysat overnight for J.G., a ten-year-old girl. On occasion, when he babysat for J.G., he would also watch L.G., J.G.'s younger sister. J.G., who is now deceased, and L.G. are the daughters of Bentley's former girlfriend, Trena Gage. J.G. called Bentley "dad." Bentley often babysat for J.G. on weekends when his wife, Richelle Bentley, was at work. Richelle testified that sometimes when Bentley babysat for J.G., Richelle would take their own children to another babysitter. In October or November 2003, Bentley took 10 Polaroid photographs of J.G. and L.G. at his home in Cedar Rapids, Iowa. The photographs of J.G. depicted her nude and provocatively posed on Bentley's bed. Her genitals were exposed in them. There was only one photograph of L.G., who was then one year old. That photo focused on her nude genitals and showed her legs held aloft by an adult hand that Richelle recognized as Bentley's.

Bentley moved to Arkansas with his family for a brief period. After the move, Richelle discovered the photographs in Bentley's coat pocket. Richelle showed the photos to her aunt, Tina Hartson, and a neighbor, Stacey Lindsey. Stacey Lindsey is married to Roger Lindsey, who was Bentley's best friend. Roger Lindsey did not see the photos, but the women discussed them with him. Richelle ultimately returned them to Bentley's coat pocket.

Richelle later confronted Bentley regarding the photographs. He first denied knowing that the photographs existed. He later acknowledged that he had seen the photographs, but claimed that they were not his. He told Richelle that he had found them under an air conditioner in their home in Cedar Rapids, Iowa. Bentley said that

-2-

he would send the photographs to Trena Gage so that she could take action on them. Bentley then took them back from Richelle, and there is no evidence that anyone has seen them since. In a separate conversation, Bentley told Hartson that he found the photos under an air conditioner on the second floor of the house in Cedar Rapids, and that he had brought them to Arkansas to burn them. He also told Roger Lindsey that he found them in the basement of the house in Cedar Rapids.

After Bentley returned with his family to Iowa, he resumed contact with Trena Gage. He resumed babysitting for J.G., including overnight visits. Bentley did not tell Trena Gage about the photographs, nor did he give them to her.

In November 2004, Bentley was arrested on a state law charge of sexual abuse based on allegations that he molested J.G.[2] He waived his <u>Miranda</u> rights and was interviewed by Cedar Rapids Police Officer Anne Deutmeyer. During this interview, Bentley denied knowing of or possessing the photographs of J.G. and L.G., and he stated that his inability to recall anything about the photographs may have been caused by excessive drinking while he was living in Arkansas.

Neither J.G. nor L.G. was able to testify at trial. J.G. was abducted and murdered by Bentley's brother, Roger Bentley,[3] while Bentley was in custody on the state law sexual abuse charges. L.G. was unable to testify because she had been an infant at the time of the charged conduct.

---

[2]Bentley was later convicted in Benton County, Iowa of sexual abuse and sentenced to 25 years in prison, to be served consecutively with his sentence in this case.

[3]Roger Bentley was convicted of first-degree murder and first-degree kidnaping of J.G. in January 2006.

Both Bentley and the government submitted motions *in limine*. Bentley sought to exclude (1) a videotaped interview of J.G. with child protection workers at St. Luke's hospital, in which she described being sexually abused by Bentley, including allegations that he took naked photographs of her and L.G.; (2) the testimony of a play therapist who interviewed J.G.; and (3) the testimony of two witnesses, A.J. and C.T., who alleged that Bentley sexually molested them when they were children. The court granted Bentley's motion with respect to the interview of J.G. and the testimony from the play therapist. The court denied Bentley's motion with respect to A.J. and C.T., finding that their testimony was admissible under Federal Rule of Evidence 414, which permits the introduction of propensity evidence in child molestation cases.

In its motion, the government sought to admit Bentley's statements to Richelle Bentley, Tina Hartson, and Roger Lindsey about where he found the photographs and what he planned to do with them. The government sought to exclude other statements Bentley made to the same individuals, in which he said that he believed the photographs belonged to his brother, Roger Bentley. The court granted the government's motion in full.

II.

Bentley first contends that his Sixth Amendment rights were violated when the district court limited his cross-examination of Tina Hartson, Stacey Lindsey, Roger Lindsey, and Officer Anne Deutmeyer. Bentley argues that the court unfairly restricted his ability to develop his defense theory that his brother, Roger Bentley, had taken the photographs of J.G. and L.G. The government argues that the trial court correctly ruled that the responses called for irrelevant speculation and hearsay.

"We review evidentiary rulings regarding the scope of cross examination for abuse of discretion, but where the Confrontation Clause is implicated, we consider the matter *de novo*." United States v. Kenyon, 481 F.3d 1054, 1063 (8th Cir. 2007)

(citations omitted). The Confrontation Clause of the Sixth Amendment is violated when cross-examination is limited to such a degree that "the trial court did not permit defense counsel to expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the credibility of the witness." Delaware v. Fensterer, 474 U.S. 15, 19 (1985) (quotation marks omitted). If the limits imposed violate the right of confrontation, we must "consider whether the record shows 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" United States v. Love, 329 F.3d 981, 985 (8th Cir. 2003) (quoting Delaware v. Van Arsdall, 475 U.S. 673, 678-79 (1986)).

Bentley argues that his ability to present his defense was hampered when the district court excluded testimony from some of the government witnesses that they originally believed that his brother, Roger Bentley, took the photographs of J.G. and L.G. On cross-examination, Bentley's counsel asked Tina Hartson whether she assumed Roger had taken the photographs when she first saw them. Later, Bentley's counsel asked Hartson about whether, in a previous deposition, she had said that she did not believe Bentley took them. The district court did not allow Hartson to respond. Similarly, during Stacey Lindsey's cross-examination, Bentley's counsel asked her whether her husband, Roger Lindsey, had talked to her about where he thought the "photographs derived from." After Stacey Lindsey answered, "Yes," the government objected and the court struck the question and answer. Similarly, the court did not permit Bentley to ask Roger Lindsey whether he had ever expressed an opinion about where the photographs came from. In so ruling, the court referred to its pre-trial order on the government's motion *in limine*.

During the testimony of Cedar Rapids Police Officer Anne Deutmeyer, she conceded that she had no firsthand knowledge of who took the photographs of J.G. and L.G. but that she had been told by "someone else" who took them. Bentley's counsel asked whether anyone told her that the photos were taken by "somebody other than James Bentley." The court did not allow the question, stating:

-5-

What somebody else may have speculated about who took the pictures is not relevant. We've had a number of questions on that. Unless you've got some foundation on that, please don't ask those questions. They're objectionable.

Bentley claims that the prohibited questions were intended to test the witnesses' memories of the circumstances surrounding the photographs, and therefore were a proper subject for cross-examination. Bentley relies on United States v. Love, 329 F.3d at 984, in which we held that the district court abused its discretion in prohibiting evidence that a key witness had a memory impairment, which "was relevant to his ability to competently recall and recount events more than a year after they allegedly occurred." However, the line of questioning pursued by Bentley was significantly different than that in Love: here, the proposed examination was not specifically designed to illuminate flaws in memory. The witnesses had all answered questions that elicited significant factual detail about the photographs. For example, they testified about the contents of the photographs and where and when they saw them. The jury had a chance to observe their capacity to recall and recount this testimony, and there was no indication that the witnesses had any memory problems. Thus, the Confrontation Clause's concern with witness credibility was not implicated by the limitations on cross-examination.

The district court did not violate Bentley's Sixth Amendment rights by limiting cross-examination of government witnesses concerning their beliefs about who might have taken the photographs.[4]

---

[4]Bentley also argues that some of the district court's rulings at trial were at odds with the Federal Rules of Evidence. We have reviewed those rulings and conclude that they were not an abuse of discretion.

III.

Bentley identifies a number of comments made by the government that he argues amount to prosecutorial misconduct and require reversal of his conviction. Bentley argues that the government inappropriately attempted to shift the burden of proof, and that the government's twice-repeated characterization of him as a "sexual predator" was improper and created inflammatory prejudice. Bentley also argues that the prosecutor made unsupported assertions in his opening statement, and argued facts outside the record during closing arguments, implying that he had knowledge of facts not presented at trial. Finally, Bentley argues that the government improperly vouched for the credibility of certain government witnesses and made inappropriate comments regarding his veracity.

"To obtain a reversal for prosecutorial misconduct, the defendant must show that (1) the prosecutor's remarks were improper, and (2) such remarks prejudiced the defendant's rights in obtaining a fair trial." United States v. Crumley, 528 F.3d 1053, 1064 (8th Cir. 2008) (internal citation omitted). Bentley objected at trial to only one of the remarks that he now cites as error. We review the remaining claims for plain error and will reverse only if "the district court's failure to take action seriously affected both the defendant's substantial trial rights and the fairness, integrity or public reputation of judicial proceedings." Id. (internal quotation marks omitted). We address the most significant of Bentley's numerous contentions, and conclude that the others are without merit.

A. Burden of Proof.

Bentley objected at trial to statements the prosecutor made in his closing argument that there was no dispute about the pornographic nature of the alleged photographs of J.G. and L.G. The prosecutor also stated that defense counsel had not cross-examined the witnesses on the contents of the photos, there was no other

evidence presented about their contents, and the defense had not argued that they were not pornographic. Bentley argues that, since these statements implied that the defense had the burden to produce evidence, they shifted the burden of proof on one of the elements of the charged offenses: whether the photographs met the statutory definition of child pornography. We review for abuse of discretion. Weddell v. Meierhenry, 636 F.2d 211, 214 (8th Cir. 1980) (trial court has broad discretion in the area of closing arguments and we will not reverse "[a]bsent a clear abuse of that discretion").

"[C]omments intended to highlight the weaknesses of a defendant's case do not shift the burden of proof . . . where the prosecutor does not argue that a failure to explain them adequately requires a guilty verdict and reiterates that the burden of proof is on the government." United States v. Vaandering, 50 F.3d 696, 701-02 (9th Cir. 1995). Rather than to shift the burden at trial, the prosecutor's comments in this case went to the weight of the testimony about the sexually explicit nature of the photographs. See Byrd v. Collins, 209 F.3d 486, 534 n.41 (6th Cir. 2000) (statement that government's evidence was "uncontradicted" was acceptable comment on "quantitative and qualitative significance" of that evidence). Additionally, the prosecutor's remarks were followed closely by an explanation that the government has the burden of proof. The district court also instructed the jury that the defendant had the presumption of innocence, the government had the burden to prove all the essential elements of each charged crime, and the defendant had no burden to prove his innocence. See United States v. Neumann, 887 F.2d 880, 887 (8th Cir. 1989) (en banc) (comment on defense failure to call witness not improper when jury received instructions that the government had the burden of proof and that the defendant did not have to produce evidence or testify). The district court did not abuse its discretion.

## B. Improper Characterization.

Bentley argues that the prosecutor's characterization of him as a "sexual predator" during the opening statement was prejudicial misconduct. Bentley relies on United States v. Cannon, 88 F.3d 1495, 1501-02 (8th Cir. 1996), abrogated on other grounds by Watson v. United States, 128 S. Ct. 579, 586 (2007), in which we held that reversible error occurred when, among other questionable statements, the prosecutor referred to defendants as "bad people." In Cannon, we found that the prosecutor's statements did not "further the aims of justice or aid in the search for truth," and were likely "to result in a verdict based on something other than the evidence." Id. at 1502. We have, however, declined to reverse the trial court even when terms such as "monster," "sexual deviant," and "liar" are used, when "[t]he weight of the evidence was heavy, and there is no reasonable probability that the verdict would have changed absent the comments . . . ." Kellogg v. Skon, 176 F.3d 447, 452 (8th Cir. 1999).

The government's theory of the case was that Bentley repeatedly committed sexual offenses against young girls, including J.G. and L.G. "Sexual predator" is a descriptive phrase that furthers the government's theory of the case, which distinguishes this case from cases where invectives serve only to inflame passions. See Cannon, 88 F.3d at 1502; United States v. Shoff, 151 F.3d 889, 893 (8th Cir. 1998) (phrase "con man" not inflammatory because it described what the government would attempt to prove at trial). Further, we conclude that the trial was not fundamentally unfair. See Skon, 176 F.3d at 451 (reversal requires "reasonable probability that the error complained of affected the outcome of the trial–i.e., that absent the alleged impropriety, the verdict probably would have been different") (citations omitted). The evidence of Bentley's guilt was strong, and there is no reasonable probability that the verdict would have changed without those remarks. The government's description of Bentley as a sexual predator was not plain error. See, e.g., United States v. Starr, 259 Fed. App'x. 904, 905 (8th Cir. 2008) (per curiam) (prosecutor's use of "pedophile" and "sexual predator" not plain error).

-9-

## C. Improper Reference to Personal Knowledge
### of Prosecutor or Facts Outside Record.

Bentley alleges error when the prosecutor said in his opening statement that Bentley did not mail the photographs of J.G. and L.G. back to Trena Gage, because this argument was not supported by direct evidence at trial. However, the government's statement was supported by circumstantial evidence and was a permissible inference from the evidence. United States v. Bolzer, 367 F.3d 1032, 1037 (8th Cir. 2004) (reference to destruction of evidence in government's opening statement permissible inference that could be drawn from the evidence at trial). Trena Gage testified that she never received the photos of J.G. and L.G. from Bentley and that Bentley never told her about them. There is no evidence that anyone saw the photographs after Richelle returned them to Bentley in Arkansas. It was not plain error for the prosecutor to make this statement.

Next, Bentley argues that he was prejudiced by the government's closing argument which repeatedly used the phrases "we know" and "I submit."[5] Although the use of these phrases has been often criticized (and discouraged) by this court and others, it is not always improper. See United States v. Beaman, 361 F.3d 1061, 1065 (8th Cir. 2004) (concluding there was no plain error but stating that "use of the phrase, 'I submit to you,' is a questionable practice"); United States v. Freisinger, 937 F.2d 383, 386 (8th Cir. 1991) (phrases such as "I suggest" and "I submit" often, but not always, used to inject prosecutor's personal belief opinion), overruling on other grounds recognized by Beaman, 361 F.3d at 1064; United States v. Younger, 398 F.3d 1179, 1191 (9th Cir. 2005) ("We do not condone the prosecutors' use of 'we know'

---

[5]Bentley tallies the uses of "we know" and "I submit" in his brief. "No such tallying is an indication of improper commentary nor can it measure the degree of impropriety if there is any." United States v. Freisinger, 937 F.2d 383, 385 (8th Cir. 1991) ("I suggest" and "I submit"), overruling on other grounds recognized by United States v. Beaman, 361 F.3d 1061, 1064 (8th Cir. 2004).

statements in closing argument, because the use of 'we know' readily blurs the line between improper vouching and legitimate summary."). It is only improper when it suggests that the government has special knowledge of evidence not presented to the jury, carries an implied guarantee of truthfulness, or expresses a personal opinion about credibility. See Beaman, 361 F.3d at 1065 ("depending on the context" the phrases "may either properly suggest how the jury should view the trial evidence, or improperly suggest that the government knows more than the jury has heard"); Younger, 398 F.3d at 1191 ("we know" not improper when used to "marshal evidence actually admitted at trial and reasonable inferences from that evidence"). Use of "we know" and "I submit" is not plain error if it is used "to refer the jury to the government's evidence and to summarize the government's case against the defendants." United States v. Lahey, 55 F.3d 1289, 1299 (7th Cir. 1995).

In closing, the government summarized "a Top Ten list" of "ten things we learned during this trial." In each instance that Bentley complains of, the government stated that "we know" a certain fact, and followed that claim with additional statements beginning with "based on" or "because of" to explain how the evidence supported that fact. Our reading of the entire closing argument convinces us that the government was referring to evidence presented to the jury and reasonable inferences that could be drawn from the evidence, and did not imply that it had special knowledge of facts not presented to the jury. Similarly, on examining the record, it appears that in all but one instance discussed below, the phrase "I submit" was used to "properly focus[] on the trial evidence." Beaman, 361 F.3d at 1065.

One of the identified statements, "I submit he's guilty of all crimes," approaches the line between proper and improper. See United States v. Papajohn, 212 F.3d 1112, 1120 (8th Cir. 2000) (distinguishing between permissible sufficiency arguments and impermissible voucher), abrogated on other grounds by Crawford v.

Washington, 541 U.S. 36, 64-65 (2004).[6]  However, Bentley did not object to this statement at trial, thus depriving the district court of the opportunity to give a curative instruction.  Even if we can say that the error was plain – "I submit" is not so strong a statement as "I believe," the phrase used in Papajohn – we cannot say that the error prejudiced the substantial rights of the defendant and would "result in a miscarriage of justice" if the verdict is not overturned.  See Papajohn, 212 F.3d at 1120.  The statement was made in the context of a summary of the evidence, and immediately after it was made, the prosecutor continued, "[B]ear in mind, each crime is different, with different elements, and look at those.  And again, I ask you to use your reason and your common sense when you go into the jury room, and I ask you to return verdicts of guilty on all counts."  Thus, the effect of any misconduct would have been minimized by the immediate exhortation that the jury examine the evidence on its own.

D. Credibility Assessment.

Bentley argues that his right to a fair trial was compromised by the government's comments on his veracity and improper vouching for the truthfulness of government witnesses.  "It is unprofessional conduct for the prosecutor to express his or her personal belief or opinion as to the truth or falsity of any testimony or evidence or guilt of the defendant."  Freisinger, 937 F.2d at 386.  It is permissible, however, to "address[] the credibility of crucial witnesses."  Beaman, 361 F.3d at 1065.

---

[6]Bentley also argues specifically that it was error when the prosecutor said, "I believe the evidence shows that he did [take the photographs] beyond a reasonable doubt."  This statement falls neatly into the category of permissible sufficiency arguments.  See Papajohn, 212 F.3d at 1120.

1.

Bentley points to a number of instances in which the prosecutor argued that Bentley offered a "false explanation" or otherwise argued that statements Bentley had made to others were not the truth. Bentley argues that such claims by the prosecutor were tantamount to a personal opinion about Bentley's veracity. "It is permissible for a prosecutor to interpret the evidence as indicating that the defendant is not telling the truth." United States v. White, 241 F.3d 1015, 1023 (8th Cir. 2001). We have held that a statement such as, "I think it is fair for you to conclude that he [the defendant] was lying to you," does not require reversal. United States v. French, 88 F.3d 686, 688-89 (8th Cir. 1996). In fact, this court questioned whether the statement in French was even error, because the prosecutor "was primarily leaving to the jury the question of the defendant's credibility." Id. at 689. Although the prosecutor stated several times that Bentley had lied in his out-of-court statements, it was not an expression of the prosecutor's personal opinion of Bentley's truthfulness. Rather, the prosecutor made arguments from the evidence that Bentley was untruthful. The question of Bentley's credibility was left for the jury to decide.

Bentley also argues that the government's comments improperly focused on his failure to testify at trial, thus violating his Fifth Amendment right to silence. In closing, the government stated, "[D]efendant didn't tell the truth to anybody, but in particular, to the police when asked about them [the photographs], because he knew they were illegal." Bentley argues that this statement was intended to focus the jury's attention on the fact that he did not testify at trial, which would require him to take an oath to tell the truth. We conclude that this argument is without merit, as the government's comments focused on the inconsistencies in Bentley's out-of-court statements, not on his failure to testify. The government's comments neither "manifest the prosecutor's intention" to comment on Bentley's silence at trial, nor would the jury "naturally take them as a comment on the defendant's failure to testify." Pollard v. Delo, 28 F.3d 887, 890 (8th Cir. 1994).

-13-

Bentley claims that the government improperly bolstered the credibility of four of its witnesses. The government may not make sweeping assurances about the veracity of its witnesses that suggest to the jury "that the government may know something that the jury does not." Freisinger, 937 F.2d at 386 (referring to comment that government witnesses "came here and told the truth"). The government may, however, comment on "the manner of the witness while testifying." Beaman, 361 F.3d at 1065. The government may also explain why the jury might find the government's witnesses credible. United States v. Papajohn, 212 F.3d 1112, 1120 (8th Cir. 2000), abrogated on other grounds by Crawford v. Washington, 541 U.S. 36, 64-65 (2004).

The government attempted to preempt suggestions that Richelle Bentley and Tina Hartson were biased because Richelle Bentley was divorcing Bentley at the time of trial and Hartson is Richelle Bentley's aunt. The government said, "I submit they are [to be believed]. I submit they were credible when they testified, and I would submit that you would believe their testimony based on that alone." The transcript shows that the government based its credibility assessment on the witnesses' demeanor at trial, not on any special knowledge. See Beaman, 361 F.3d at 1065. The jury was free to make its own credibility determinations. Id.

With regard to A.J. and C.T., the Rule 414 witnesses who testified that Bentley previously molested them, the government stated:

> [Y]ou have to decide whether you believe these witnesses by a preponderance of the evidence. Is it more likely than not that those witnesses were telling the truth? And I submit that it is more likely that they were telling the truth, because consider how hard it is to come into

a courtroom like this and tell a story like that. Why would they come in here to tell that story if it wasn't true?

The prosecutor based his credibility argument on evidence elicited at trial. He noted that C.T. and A.J. had to face personal pain and embarrassment in order to testify about prior sexual abuse and, thus, their testimony was unlikely to be fabricated. He also pointed to similarities in C.T.'s and A.J.'s testimony as reasons that the jury might find them credible. While we have expressed concern about the prosecutor's use of the phrase "I submit," here the prosecutor's argument focused on credibility evidence and the jury's role in determining credibility, not the prosecutor's personal opinion of the witnesses' credibility. See Papajohn, 212 F.3d at 1120. This was not plain error.

IV.

Finally, Bentley contends that the admission of C.T.'s and A.J.'s testimony was error. Specifically, Bentley argues that the events underlying C.T.'s and A.J.'s testimony were too remote in time and too dissimilar from the charged conduct to be probative. He also argues that C.T.'s and A.J.'s testimony was exaggerated from their earlier claims of abuse by Bentley and thus was substantially more prejudicial than probative, and should have been excluded under Federal Rule of Evidence 403. We review the district court's evidentiary ruling for abuse of discretion. United States v. Gabe, 237 F.3d 954, 959 (8th Cir. 2001).

C.T. testified that, in or around 1998, Bentley and his girlfriend lived in the basement of C.T.'s family home. C.T. was 12 years old at the time. She testified that on three occasions, Bentley touched her inappropriately, removed her pants and underwear, and had intercourse with her on his bed. On two of these occasions, Bentley was the only adult in the house. On the third occasion, C.T.'s aunt was also

-15-

in the home, but was upstairs. On cross-examination, C.T. testified that Bentley did not take any photographs of her or show or discuss child pornography with her.

A.J. testified that she lived with Bentley and her mom, Richelle Bentley, from approximately 1994 to 1996, when A.J. was three to six years old. This period was both before and while Bentley was married to Richelle. During that time, A.J. testified that Bentley touched her "underneath my pants and my shirt" on several occasions. A.J. also testified that Bentley had intercourse with her once. The abuse occurred both in Bentley's bedroom and in the living room, and occurred mostly while Richelle was at work and once while Richelle was sleeping in another part of the house.

Federal Rule of Evidence 414 is an exception "to the general rule that evidence of past crimes may not be used to prove the character of a person in order to show action in conformity therewith." United States v. Withorn, 204 F.3d 790, 794 (8th Cir. 2000) (quotation marks omitted). Rule 414(a) states:

> In a criminal case in which the defendant is accused of an offense of child molestation, evidence of the defendant's commission of another offense or offenses of child molestation is admissible, and may be considered for its bearing on any matter to which it is relevant.

Notwithstanding this general rule of admissibility, evidence admitted pursuant to Rule 414 is subject to Rule 403's balancing test, "which calls for the exclusion of evidence whose probative value is substantially outweighed by its potential for unfair prejudice." Withorn, 204 F.3d at 794. In order to exclude evidence under Rule 403, however, it must be unfairly prejudicial. Gabe, 237 F.3d at 960. "Because propensity evidence is admissible under Rule 414," the fact that evidence of prior acts suggests a propensity to molest children, "is not *unfair* prejudice." Id. (emphasis original).

-16-

The district court issued a reasoned opinion examining the similarities and differences between C.T.'s and A.J.'s testimony and the charged conduct and concluding that "the risk of unfair prejudice" from the prior act testimony was low. Significantly, it found the following similarities: (1) "[a]ll four alleged victims are female;" (2) all four were "young children" at the time of the alleged abuse; and (3) "[a]ll four girls were visiting or living in Defendant's residence at the time of the alleged abuse." The district court also noted that "A.J. is Defendant's step-daughter, Defendant lived with C.T.[,] and J.G. considered Defendant a father figure and called him 'Dad.'" Additionally, Bentley allegedly molested all four victims in his own bedroom or on his own bed while his wife and any other adults in the household were not home or were in other rooms. The testimony tends to prove Bentley's propensity to molest young girls who are actual or virtual members of his family or live in his home when presented with an opportunity to do so undetected. See Gabe, 237 F.3d at 960. The district court found that those similarities outweighed the differences in the nature of the offenses – that Bentley penetrated C.T. and A.J. and did not take photographs of C.T. or A.J.[7]

The time lapse between the prior acts (1994-1998) and the criminal conduct alleged here (2003) is not so long as to require its exclusion. We have upheld the admission of Rule 414 testimony describing events that occurred more than 20 years before trial. Gabe, 237 F.3d at 959 ("[I]t is reasonable to assume that a victim of child abuse is not likely to forget such a traumatic event.").

---

[7]Bentley cites United States v. Sumner, 119 F.3d 658 (8th Cir. 1997), in support of his contention that these differences render the testimony inadmissible. However, Sumner is easily distinguishable: it found error in admitting evidence of prior acts under Rule 404(b), which prohibits the use of prior acts evidence for propensity. Id. at 661 ("The evidence therefore does no more than show that Sumner has 'a propensity to commit crimes, which Rule 404(b) prohibits.'"). Propensity evidence is precisely what Rule 414 permits.

The jury heard vigorous cross-examination that probed the reliability of C.T.'s and A.J.'s testimony. C.T. testified about her interview at Saint Luke's Child Protection Center and her testimony from a deposition around the time of the abuse. Bentley cross-examined C.T. with sworn testimony during 1998 or 1999, where she denied that the abuse had occurred. A.J. testified on cross-examination about her reporting of the abuse, and admitted that she did not allege that Bentley had penetrated her until two years after her initial interview. This testimony permitted the jury to adequately evaluate the reliability of the Rule 414 witnesses.

Finally, the court also took precautions to limit the prejudicial nature of the Rule 414 testimony. Both before C.T. and A.J. testified and then in its final charge, the court instructed the jury about permissible uses of the testimony, explained the presumption of innocence and applicable standard of proof, and cautioned the jury that it may not convict a person simply because it believes he may have committed other acts. For these reasons, we conclude that the district court did not abuse its discretion by admitting C.T.'s and A.J.'s testimony under Rule 414.

The judgment of conviction is affirmed.

_____