IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 69032-9-I |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ZACHARY NELSON, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | FILED: November 18, 2013 |
| | ) | |

VERELLEN, J. — Zachary Nelson appeals from the jury determination that he is a

sexually violent predator. He contends that the deputy prosecutor committed reversible

misconduct during cross-examination and closing argument by the frequent use of "we"

and "us" and phrases such as "we know." But when viewed in context, the majority of

the challenged comments were not misconduct, and defense counsel's failure to object

limits our review of any potentially improper comments. We therefore affirm.

FACTS

On June 13, 2011, the State filed a petition seeking to commit 20-year-old

Zachary Nelson as a sexually violent predator. Nelson's extensive history of sexual

contact with children began when he was four years old. In 1996, a daycare reported to

Child Protective Services (CPS) that Nelson had pulled down the pants of another boy

and that the two were fondling one another. The records also indicated that the boys

had performed oral sex on one another multiple times.

In 2000, a CPS referral reported that Nelson had threatened to beat a seven-year-old girl if she did not suck his penis. Nelson admitted that he had performed oral sex on the girl. In 2001, a four-year-old boy reported that Nelson had forced him to perform oral sex. Nelson acknowledged the contact. The King County Sheriff's Office investigated the incident, but no charges were filed because of Nelson's age.

A 2002 sexually aggressive youth (SAY) evaluation concluded that Nelson had poor impulse control, a limited ability to control his emotions when upset, and sexual fantasies about younger children, and that he posed a moderate to high risk for further sexual misconduct. Following the SAY evaluation, Nelson spent several years in a series of residential treatment centers.

Based on an incident that occurred in September 2006, shortly after he moved back in with his mother, Nelson pleaded guilty to one count of first degree child molestation. Nelson acknowledged that he had sexually assaulted a five-year-old neighbor girl whom he had invited into his bedroom. After sentencing, Nelson admitted that he had molested the girl on at least one other occasion.

In June 2007, Nelson entered a neighbor's house through an unlocked door in search of two young boys who lived in the house. He eventually found them sleeping next to their mother in the mother's bedroom. He pulled one of the boys, four-year-old J.W., away from his mother and before he was interrupted by the victim's older brother, removed J.W.'s pants, fondled the boy's penis, and digitally penetrated his anus. Nelson later admitted that he had sexually assaulted both boys on prior occasions. Based on the incident, Nelson pleaded guilty to one count of first degree child molestation and one count of first degree burglary with sexual motivation. In an

2

unrelated case, Nelson pleaded guilty to fourth degree assault after he allegedly sexually assaulted a 15-year-old boy.

Nelson served the resulting sentence at the Juvenile Rehabilitation Administration's Maple Lane facility. At Maple Lane, his behavior was frequently disruptive, and he committed about 80 infractions over the course of several years. Nelson resisted the available sex offender treatment and his progress was poor.

In March 2011, as Nelson's release date approached, the Department of Corrections hired Dr. Harry Hoberman, a clinical and forensic psychologist, to determine whether Nelson met the criteria of a sexually violent predator. At the commitment trial, Dr. Hoberman testified that he had reviewed Nelson's CPS records, treatment records, police reports, victim statements, the SAY evaluation, and other juvenile records, and had spoken with Nelson's sex offender treatment coordinator and the staff psychologist at Maple Lane. Hoberman also interviewed Nelson and administered a series of psychological tests, including the Minnesota Multiphasic Personality Inventory (MMPI–2) test and the Multiphasic Sex Inventory. Nelson told Hoberman that his sexual arousal for children had not disappeared completely, but claimed that his feelings were "highly suppressed."[1]

Based on his evaluation, Hoberman diagnosed Nelson with pedophilia, a mental abnormality characterized by intense recurrent sexual fantasies and urges or sexual behaviors involving prepubescent children. Hoberman also diagnosed Nelson with antisocial personality disorder, a diagnosis supported by Nelson's lengthy history of deceitful, impulsive, and unlawful behavior. Hoberman concluded that each of Nelson's

---

[1] Report of Proceedings (RP) (May 21, 2012) at 77.

conditions caused him to have serious difficulty in controlling his sexually violent behavior.

Hoberman also conducted a risk assessment using multiple actuarial measures and a "structured professional judgment"[2] based on multiple assessment tools. He concluded that all of the assessment measures identified Nelson "as a person with the characteristics of someone who is more likely than not to commit a future act of sexual violence."[3]

After filing the commitment petition, the State hired psychologist Dr. Henry Richards to conduct another evaluation. Dr. Richards diagnosed Nelson with pedophilia, nonexclusive type, attracted to males and females, and with antisocial and narcissistic personality disorders. Nelson scored in the high range for psychopathy, and exhibited a deviant sexual arousal, based on his pedophilia and deviant interest in animals and possibly sadism. Richards concluded that Nelson's disorders, individually and together, undermined his ability to control his behavior. Based on actuarial risk assessment measures and clinical and dynamic risk factors, Richards concluded that Nelson posed a high risk for committing new predatory sexual offenses.

Dr. Diane Lytton, a defense psychologist, strongly disagreed with the evaluation methods and conclusions of both Hoberman and Richards. In particular, she criticized their failure to take into account the difficulty of applying pedophilia and personality disorder diagnoses to adolescents who are still in the process of developing and maturing.

---

[2] Id. at 136.
[3] Id. at 139.

Dr. Lytton found that Nelson did not currently exhibit traits of a personality disorder and that despite occasional "outbursts,"[4] he did not have serious difficulty controlling his behavior. Lytton concluded that although Nelson might have attention deficit hyperactivity disorder, he did not suffer from a mental abnormality or personality disorder. Lytton believed that Nelson had demonstrated sufficient knowledge of appropriate risk-management techniques and was not more likely than not to reoffend if released from confinement.

Nelson testified that he became more self-aware and had started to make meaningful progress in treatment during his final year at Maple Lane. Upon release, he planned to live with his grandparents, attend school, and find work. He repeatedly expressed the belief that he was now able to control himself sufficiently to prevent any reoffense. He denied that he had ever been sexually attracted to children and claimed that Dr. Hoberman had misunderstood his comments. He explained that his prior conduct reflected only a desire for sexual conduct and that he had believed that sexual contact with children was acceptable because he had been offended against as a child and nothing was done about it.

Nelson denied any need for sexual deviancy treatment upon release, but was willing to use the assistance of a counselor if necessary. He disputed the diagnoses of the State's experts and claimed that Dr. Hoberman was biased and had cheated on some of the tests by changing his answers.

The jury found that Nelson was a sexually violent predator.

---

[4] RP (May 22, 2012) at 133.

ANALYSIS

Nelson contends that prosecutorial misconduct during cross-examination and closing argument violated his right to a fair trial. He argues that the deputy prosecutor's frequent use of the pronouns "we" and "us" and phrases such as "we know" communicated her personal opinion, vouched for the State's witnesses, and generally aligned the prosecution with the jury's perspective.

A defendant claiming prosecutorial misconduct bears the burden of establishing that the challenged conduct was both improper and prejudicial.[5] Prejudice occurs only if "there is a substantial likelihood the instances of misconduct affected the jury's verdict."[6] We review misconduct claims in the context of the total argument, the evidence addressed, the issues in the case, and the jury instructions.[7] Where, as here, the defendant fails to object, we will not review the alleged error unless the defendant demonstrates that the misconduct was "so flagrant and ill intentioned that no curative instructions could have obviated the prejudice engendered by the misconduct."[8]

Nelson contends that the following exchange during his cross-examination exemplifies the deputy prosecutor's improper use of personal pronouns and related phrases:

Q:    Mr. Nelson, one thing I just want to communicate to you is *we all understand that's what you want.* You don't want to offend against children anymore, correct?

A:    Correct.

---

[5] State v. Cheatam, 150 Wn.2d 626, 652, 81 P.3d 830 (2003).

[6] State v. Pirtle, 127 Wn.2d 628, 672, 904 P.2d 245 (1995).

[7] State v. Boehning, 127 Wn. App. 511, 519, 111 P.3d 899 (2005).

[8] State v. Belgarde, 110 Wn.2d 504, 507, 755 P.2d 174 (1988).

Q: And in *your* words to Dr. Hoberman, you'll use all of your willpower and all of everything you've learned to try to prevent yourself from doing that, correct?

A: Correct.

Q: The miscommunication perhaps between you and I is the fact that we believe you suffer from a mental abnormality or personality disorder which may prevent you from being able to do exactly that. Do you understand that's *our perspective?*

A: That can be your perspective, yes.

Q: You disagree with that?

A: I respectfully disagree, as I said in my deposition.[9]

Nelson also contends the following questions during his cross-examination were improper:

Q: You plead to just one count involving [J.S.], even though *we now know* there's been more than that, correct?

. . . .

Q: . . . [Y]ou never admitted [to the detective] any molestations or rapes of [the two neighbor boys] other than what occurred at the shed in your yard, correct?

. . . .

Q: *We now* know that wasn't true?

. . . .

Q: And *you* repeatedly denied [to the detective] that there [were other victims]?

. . . .

Q: *We now know* that isn't true, correct?[10]

Nelson alleges that the deputy prosecutor committed similar misconduct throughout cross-examination when she asked Nelson whether he could understand

---

[9] RP (May 30, 2012) at 41.

[10] Id. at 31, 32, 33 (emphasis added).

why "we" were "concerned"[11] about certain matters, including his claimed lack of need for treatment following release, and prefaced questions with comments such as "you tell us."[12] He asserts that misconduct also occurred during Nelson's deposition, which was played for the jury, and during the questioning of certain other witnesses.

Finally, Nelson claims the misconduct continued unabated during closing argument with frequent references to what "we know," what "we learned," and what "we" saw during the trial:

> [W]hat *we've learned* about the respondent in this case is that he's very good at creating his own opportunities. . . .
>
> *We see* by age 5, *we have* an admission from him of a time that he performed oral sex on another child while they were in bed together, and *we see* by 8, he's learning to create his own opportunities to molest.
>
> . . . .
>
> *We know* from that evaluation that there's a finding that he's at moderate to high risk to reoffend. And it's correct. He does, despite the efforts of the system, and *we all know* the system failed him here, maybe his mother failed him in life, *I understand that. We all recognize that.*
>
> . . . .
>
> *We know* that we likely aren't even aware of his full offending history. These *are* just the things *we know about.* . . .
>
> . . . .
>
> And regarding element number 3, that's where *we spent* some time during the trial talking about the risk assessment of Mr. Nelson.[13]

With one insignificant exception, defense counsel raised no objection to any of alleged improper comments.

---

[11] Id. at 28.

[12] Id. at 20.

[13] RP (May 31, 2012) at 12-13, 18, 30.

"It is misconduct for a prosecutor to state a personal belief as to the credibility of a witness."[14] Improper vouching generally occurs if the prosecutor expresses her personal belief as to the veracity of the witness or indicates that evidence not presented at trial supports the witness's testimony.[15] Because prosecutors have a wide latitude to argue reasonable inferences from the facts concerning witness credibility, however, we will not find prejudicial error unless it is clear and unmistakable that counsel is expressing a personal opinion.[16]

Courts have discouraged the frequent use of the phrase "we know" and related formulations during jury arguments because the identity of the referenced group "we" may be ambiguous.[17] Moreover, the intended reference is not necessarily static and may change from one sentence to the next as the context of the question or argument changes. "The question for the jury is not what a prosecutor believes to be true or what 'we know,' rather, the jury must decide what may be inferred from the evidence."[18] But the use of such phrases is generally improper only "when it suggests that the government has special knowledge of evidence not presented to the jury, carries an implied guarantee of truthfulness, or expresses a personal opinion about credibility."[19]

---

[14] State v. Warren, 165 Wn.2d 17, 30, 195 P.3d 940 (2008).

[15] State v. Ish, 170 Wn.2d 189, 196, 241 P.3d 389 (2010).

[16] State v. Allen, 176 Wn.2d 611, 631, 294 P.3d 679 (2013).

[17] United States v. Younger, 398 F.3d 1179, 1191 (2005).

[18] Id.

[19] United States v. Bentley, 561 F.3d 803, 812 (8th Cir. 2009); see also State v. Mayhorn, 720 N.W.2d 776 (Minn. 2006) (prosecutor committed misconduct by appealing to the passions and prejudices of the jury by improperly revealing prejudicial information about the defendant, by commenting on the defendant's failure to call a witness, by intentionally misstating the evidence, by referring to the defendant's threats that were not in evidence, and by aligning the prosecution with the jury in commenting,

When viewed in context, the vast majority of the challenged comments here were clearly not improper. The deputy prosecutor's repeated assertions of "we know" or "we have learned" during cross-examination and closing argument merely summarized the evidence that had been admitted and evidence that was undisputed or suggested reasonable inferences drawn from that evidence.[20] When cross-examined about matters that "we now know," Nelson clearly understood that the question referred to evidence that he had initially denied or minimized the real extent of his sexual offense history. Nothing in the record suggests that the jury would have understood the reference differently. The deputy prosecutor did not offer personal assurances about the credibility of the State's witnesses or imply the existence of admitted corroborative evidence not admitted.[21]

The State acknowledges that the use of "we" and "us" may not always be the best practice, and in a few instances, the deputy prosecutor's choice of words was at least questionable. For example, during cross-examination of Nelson, the deputy prosecutor arguably broadened the scope of "we" when she asked, "Can you

---

"This is kind of foreign for all of us, I believe, because we're not really accustomed to this drug world and drug dealing.").

[20] See State v. Clapp, 67 Wn. App. 263, 274, 834 P.2d 1101 (1992) (there is no misconduct "[w]hen counsel does no more than argue facts in evidence and suggest reasonable inferences from that evidence").

[21] See Younger, 398 F.3d at 1191 (no misconduct where prosecutors used the phrase "we know" to "marshal evidence actually admitted at trial and reasonable inferences from that evidence, not to vouch for witness veracity or suggest that evidence not produced would support a witness's statements"; Bentley, 561 F.3d at 812 (prosecutor's frequent use of "we know" during closing argument was proper reference to evidence presented to the jury and reasonable inferences that could be drawn from the evidence); United States v. Ruiz, 710 F.3d 1077, 1086 (9th Cir. 2013) (prosecutor's use of "we know" properly summarized evidence admitted at trial and reasonable inferences and did not suggest that evidence not admitted would support a witness's statement).

understand why we may all sit here and be extremely concerned" about the fact that Nelson denied any need for sex offender treatment.

But in each case, a prompt objection and curative instruction could have negated any potential prejudice. Moreover, a prompt objection here would have addressed Nelson's claim that the deputy prosecutor's frequent use of "we" and "us" exacerbated the resulting prejudice.

Significantly, defense counsel, who did not hesitate to challenge the admission of evidence throughout the trial, raised no objection to the alleged misconduct and regularly used similar phrases himself during questioning and closing argument. Counsel's failure to object strongly suggests that he did not find the deputy prosecutor's comments improper or prejudicial in context.[22]

In summary, the deputy prosecutor's use of "we" and "us" was generally not misconduct. Any arguably improper comments were not so egregious as to engender incurable prejudice. Nelson's claim of prosecutorial misconduct therefore fails, and "our analysis need go no further."[23]

Affirmed.

WE CONCUR:

---

[22] State v. Swan, 114 Wn.2d 613, 661, 790 P.2d 610 (1990).

[23] State v. Emery, 174 Wn.2d 741, 764, 278 P.3d 653 (2012).