# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>Respondent,<br><br>v.<br><br>FELICIA LOUISE ADAMS, aka FELICIA LOUISE ADAMS-FRANKS,<br><br>Appellant. | No. 59082-4-II<br><br><br>ORDER CORRECTING OPINION |

The panel having determined that the opinion should be changed to correct scrivener's errors, it is hereby

ORDERED that the opinion of this court in the above-entitled case filed March 24, 2026, be changed as follows:

- Page 1, "adoptive" shall be deleted and replaced with "adopted."

- Page 2, "Adams and her husband, Jesse Costillo Franks, adopted KR, KC, and KA in 2012." shall be deleted and replaced with "Adams was married to Jesse Costillo Franks. Adams adopted KR, KC, and KA in 2012."

- Page 42, "visitation with their two adoptive" shall be deleted and replaced with "visitation with Adams' two adopted."

- Footer, the file path "O:\Misc\OPINION FILING\TXR Unpublished\59082-4.26.docx2" shall be deleted.

The remainder of the opinion shall stay the same. Accordingly, it is

**SO ORDERED.**

**PANEL:** Jj. Glasgow, Price, Che,

**FOR THE COURT:**

_Che, J_

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>Respondent,<br><br>v.<br><br>FELICIA LOUISE ADAMS, aka FELICIA LOUISE ADAMS-FRANKS,<br><br>Appellant. | No. 59082-4-II<br><br>UNPUBLISHED OPINION |

CHE, J. — Felicia Adams appeals her convictions and sentence for one count of homicide by abuse and two counts of criminal mistreatment.

Adams argues insufficient evidence supported the homicide by abuse conviction because the State did not prove she manifested an extreme indifference to human life in her actions leading up to the death by starvation of her oldest adoptive son, KR. Adams additionally claims the trial court violated her constitutional right to present a defense by prohibiting Adams from playing the entire recordings of her two other adopted sons' interviews with a child abuse pediatrician or submitting transcripts of the interviews into evidence. Adams also raises evidentiary errors tied to the admission of hearsay evidence and evidence of flight, the cumulative error doctrine, and a claim the trial court violated Adams' constitutional rights by finding substantial and compelling reasons justified an exceptional sentence.

We hold (1) sufficient evidence supports Adams' homicide by abuse conviction, (2) the trial court did not violate Adams' right to present a defense by excluding the recordings of the

interviews, (3) reversible error did not occur by the trial court's evidentiary decisions, (4) the cumulative error doctrine does not compel reversal, and (5) consistent with case law, the trial court did not violate Adams' constitutional rights in its imposition of an exceptional sentence.

Accordingly, we affirm Adams' convictions and sentence.

FACTS

Adams and her husband, Jesse Costillo Franks, adopted KR, KC, and KA in 2012. KR, KC, and KA were biological brothers and nephews of Adams. At the time of their adoption, KR, KC, and KA were, respectively, seven, six, and four years old.

KR, the oldest child, had autism, developmental delays, incontinence, visual impairment due to aniridia,[1] and was largely nonverbal. KR had many of these conditions for most of his life but none of these conditions affected KR's ability to grow or maintain a healthy weight. When eating, KR did not always chew his food and he would swallow his food, regurgitate it, and then swallow it again.

Between 2016 and 2019—when KR was in sixth through eighth grades, KR had breakfast, a mid-morning snack, and lunch at school. KR always appeared hungry and would always eat the full meals. KR was "obsessed" with food and appeared to beg by hunching over and staring at other kids as he watched them eat. 8 Rep. of Proc. (RP) at 1185. He also tried to get into the school's refrigerator.

Cameron Brothers, KR's middle school teacher during this time, was concerned by KR's constant hunger and skinny appearance, but was not concerned that KR was starving. When Brothers observed KR still hungry after lunch, he would give KR an extra apple. At one point,

---

[1] Aniridia is a condition when the irises do not form normally.

Adams and Franks instructed Brothers not to give KR a lot of extra food or snacks as they were concerned with KR's eating issues.

Through these years, KR was skinny but strong and "full of energy." 8 RP at 1161. Brothers described KR's physique as "just like any other sixth, seventh grade boy." 8 RP at 1161.

In July 2019, KR weighed 115 pounds which was more or less to be expected with his growth and physical development.

When KR attended his freshmen and sophomore years of high school before the COVID-19 pandemic, KR continued to receive breakfast and lunch at school. Like in middle school, KR always appeared hungry, would always eat his full meal, and would take other nearby food if he could reach it. As soon as KR would get off the bus in the morning, he would clearly say, "Eat. Eat. Eat." 8 RP at 1210. Adams and Franks continued to ask that KR's snacks be limited.

At home, Franks and Adams were strict about food. The boys got three meals a day and either Adams or Franks cooked them dinner. However, the kids were not allowed to get food, including snacks, without asking and, even if they asked, sometimes they would not get anything. According to the boys' cousin who lived with them during middle and high school, if there were leftovers at meals, the kids had to ask for seconds. Sometimes during or after dinner, the boys and the cousin would get fruit or candy as snacks.

Younger brothers, KC and KA, sometimes took food without permission, which Adams and Franks referred to a "stealing." 9 RP at 1557. When KC and KA got into trouble, they would either be spanked with a belt, paddle, or extension cord or go without food. The spanking left marks on the boys' backs, buttocks, and the backs of their legs. Adams also strangled KC a

few times, including once with an extension cord as punishment for taking food and having food wrappers behind his bed.

When food went missing, the boys could not eat until someone admitted to taking the food. If the person who took the food did not say anything, another boy took the blame. Occasionally, KC and KA went a couple days without eating before someone admitted to taking the food. According to KC, he had even gone a week without food after getting in trouble. He estimated that the longest he went hungry was close to a month.

The last time KR's high school teacher saw him in person was before the pandemic, and KR appeared relatively healthy. Although KR was thin, he had a lot of muscle tone, was active, and appeared to have a normal weight for his size and age.

In March 2020, KR did not return to in-person classes due to the pandemic. KR attended some classes as they transitioned to a virtual format but his attendance in school changed. Between September and November 2020, KR's teacher saw him only a total of five times.

Close to the beginning of the COVID-19 pandemic, Adams hired her nephew to help care for KR.[2] In June, Adams had a heart attack. The heart attack affected Adams' ability to go to work, affected her energy level, and made her more temperamental. Adams' sister believed that, after Adams' heart attack, "[Adams] could no longer really care for [the boys] how she did before, and so she kind of started to maybe just focus on herself and her health." 8 RP at 1339-40. The nephew as well as KC and KA helped KR with showering, dressing, and using the bathroom. And so, according to Adams, Adams did not often see KR with his shirt off from July onwards.

---

[2] Adams worked from home at this time and Franks also stayed at home most of the time.

During the pandemic, food was more restricted. KC and KA took food more often and they were punished by food restrictions or food not being offered to them. Other times, the three boys were only given half portions as punishment while Adams and Franks ate full portions. In the months leading up to KR's death, the boys received half portions at nearly every meal.

KR was mostly fed rice, mashed potatoes, and vegetables, and he sometimes had prepackaged protein shakes. Adams added the protein shakes into KR's meals sometime in November after someone brought KR's thin appearance to Adams' attention.

If KR ate too fast, Adams and Franks took the food away from him in order to stop KR from regurgitating his food. This happened almost every day. When KR would begin regurgitating his food, Adams yelled at him and hit him with her hand or a cane to get him to stop.

During this time, Adams and Franks also installed a lock on the outside of the boys' shared room. They had to knock to exit the room and use the bathroom. KA and KC believed the lock was installed so as to prevent them from taking cookies or sweets at night. According to KA, he and KC were locked in their room "most of the time." 9 RP at 1575. The boys also had to get permission before going outside. By November 2020, the boys had not gone outside in months.

According to KA, Adams and Franks discussed that KR was getting skinny. KA recounted an instance when Franks told KA that Adams had told Franks, "[I]f something happened to [KR], she would take the blame for that." 9 RP at 1572. At some point, Adams made a doctor's appointment for KR for mid-November; however, the appointment overlapped with one of her own appointments and so she had to reschedule it for the end of November.

Adams' nephew noticed, over time, KR was getting skinnier and eventually began to fall down while standing but otherwise "he just looked okay." 8 RP at 1379. KA, KC, and other extended family members, however, grew concerned by KR's appearance. They observed that KR was very skinny, appeared weak and unable to walk or get up stairs normally, and had dark marks around his eyes. If KR could not get up, he did not get to eat that day. KR was always hungry and would cry late at night. KA and KC also appeared skinnier than they were prior to the pandemic. At times, KA and KC told Adams' nephew that they were hungry.

KR's high school teacher last saw KR on November 20 and, at that time, observed KR less interactive, his cheeks appeared sunken in, and his head appeared very large. The teacher also observed something on KR's neck but, because they could not tell what it was, they assumed it was dirt.

On the evening of November 21, a Child Protective Services (CPS) social worker visited Adams and Franks' residence based on Adams' sister calling CPS. Adams' sister had seen KR the previous day and he appeared very thin. She "felt like [KR] was getting ready to pass away," possibly that he was sick, and she "wasn't getting a lot [of information] from [Adams]." 8 RP at 1339.

When the social worker entered the home, they observed food sitting on counters and a lock on the outside of the boys' bedroom door. The social worker found KR sitting in the living room and was told he was nonverbal and autistic. When the social worker got close to KR and said his name, KR made no response. KR was fully clothed and appeared very tall with a long, slender neck. While the social worker observed all three boys were very thin, KR appeared the

thinnest. The social worker observed KR swaying back and forth in a rocking motion while sitting on the couch.[3]

During the visit, the social worker spoke to KA and KC separately. KC told the social worker that he felt safe, that he had plenty of food that he could access whenever he wanted it, and that he had never been denied food, including as punishment. KC also told the social worker that he was not physically disciplined. In contrast, KA told the social worker that sometimes food was withheld and physical discipline was imposed, which raised concerns of abuse.

The social worker did not remove the children from the home that night. Nor did the social worker believe at the time that the children were on the brink of starvation.

On November 27, less than a week after the CPS home visit, KC tried to wake KR and noticed there were feces and urine all over the bed and KR. KC called Adams into the room and they both carried KR into the bathtub. KR appeared awake to KC but "unresponsive" as he was not moving a lot nor verbalizing anything. 9 RP at 1470. At one point, KA felt KR's chest and said that he did not feel a heartbeat. Because of KR's unresponsiveness and KA's not feeling a heartbeat, it appeared to KC that KR's heart stopped multiple times while KR was in the bathroom. KC also observed that KR's body looked skinny. Adams dried KR and laid him on the floor, but KR was not responsive. Adams and Franks carried KR to the car, and Adams took him to the hospital.

When KR arrived at the hospital, medical staff determined he was in cardiac arrest and required CPR. KR was so cachectic[4] that medical staff were unable to provide medications

---

[3] The social worker testified they were familiar with such swaying and the behavior was typically associated with self-soothing.
[4] Cachectic is a medical term for loss of fat and muscle tissue.

through one of KR's veins and, instead, had to drill a catheter into KR's bone. After performing CPR on KR for 16 minutes, hospital staff declared KR dead at 9:50 AM. KR appeared "very, very underweight" and had some scratches to the neck and chest. 6 RP at 782. Based on KR's thin appearance, the scratches, a statement Adams made to the doctor that she stopped "at length" on her way to the hospital, and an observation that Adams had been playing loud music when she arrived, a doctor at the hospital asked hospital staff to make a CPS report. 6 RP at 788. Later that day, after KR died, Adams and Franks twice visited a casino they frequented, once at 12:24 PM and again at 7:22 PM.

The medical examiner performed an autopsy on KR's body. KR was fifteen years old at the time of his death and weighed 61 pounds. The medical examiner diagnosed KR with starvation, immobility and neglect, bilateral pneumonia, and contusions and abrasions. KR's body showed contusions or abrasions on his forehead, hip, thighs, and neck. KR had aspirated food in his lungs.

The day after KR died, CPS took KA and KC into protective custody. A social worker with CPS found the boys to be "extremely skinny and emaciated" with their shoulder and rib bones showing. 7 RP at 985. The social worker also observed that both boys were difficult to communicate with and very withdrawn. KA and KC's presentation concerned the social worker, who recommended KA and KC undergo medical examinations including testing their bone density and immediate counseling. They also initiated a search for a foster placement with experience working with children who had experienced "significant trauma." 7 RP at 986.

CPS brought KC and KA to an emergency department for evaluation under suspicion of child abuse. CPS and hospital staff took photographs of KA and KC's physical appearances.[5] CPS and the hospital staff photographed markings on the boys' skin, including a linear mark on KC's back, that raised suspicions of potential burns, lashings, or strikes. KC and KA told hospital staff that any pain they had was from playing football.

Hospital staff measured KC to be 4 feet and 11.5 inches tall and weighing 76 pounds and 15.1 ounces. KA was 5 feet and 2.5 inches tall and weighed 86 pounds and 3.2 ounces. The examining physician found KA and KC to be "[a]t risk of lacking adequate care and protection" and "[u]nderweight in adolescence" based on their thin appearance. 9 RP at 1416.

When KC and KA arrived at their foster placement, their foster parent observed that they appeared underweight and did not have a lot of strength or endurance to do activities typical of like-aged children, such as riding bikes or climbing stairs to get to the top of waterslides. KC and KA "acted like they were hungry all of the time." 8 RP at 1270. Although they had "full access" to food in their foster home, KC and KA hid food all over the house, including in spaces behind the drawers of a desk and in shoes. 8 RP at 1270. KC made a slit in a mattress to hide food. Their foster parent found it "just astonishing how creative they were with finding places in the house . . . to hide food, which most of it would just go bad because they didn't need it." 8 RP at 1271. KC and KA also urinated in containers and bags and "stash[ed] those around their room" despite their bedroom being located next to a bathroom and not having a lock on their bedroom door. 8 RP at 1273.

---

[5] Copies of these photographs were admitted into evidence without objection.

In January 2021, Dr. Copeland, a child abuse pediatrician, interviewed KC and KA separately after the emergency department referred them to her with concerns of possible physical abuse, neglect, and nutritional deficiency. Dr. Copeland obtained a medical history of both boys and conducted physical exams of them as well. Dr. Copeland also reviewed KR's medical records.

At the time of Dr. Copeland's examination, KC weighed 94 pounds—a greater than 17-pound increase in weight from when KC was removed from Adams and Franks' care in November. Dr. Copeland found this amount of weight gain significant in that, even despite KC being sick with a COVID-like illness for two to three weeks since November, KC "still showed the potential to have normal growth when provided adequate nutrition." 10 RP at 1685-96. During 19 months in foster care, KC gained 65.5 pounds.

Dr. Copeland measured KA as weighing 97 pounds and 4 ounces, a nearly 11-pound difference from when he was examined in November. Based on the trend of KA's historical weights and heights, Dr. Copeland expected KA to have been 1.5 inches taller and about 19 pounds heavier in November. Dr. Copeland observed that KA had only gained 5.5 pounds in the two years leading up to November, causing KA's growth curves to decrease both in weight and height.[6] To Dr. Copeland, this change indicated that KA's nutritional deprivation was not "just a temporary situation. It went on long enough and was severe enough that it affected not just

---

[6] Using KA and KC's medical history and later medical reports of KC and KA's progress once in foster care, Dr. Copeland plotted KC and KA's height and weight throughout time on growth charts. These growth charts illustrating KC and KA's growth plotted on seven different percentile lines were admitted into evidence.

weight but also height." 10 RP at 1723. Through two years of foster care, KA gained 64 pounds and grew 6 inches.

Dr. Copeland developed an opinion that all three boys had had "a pattern consistent with significant medical neglect" through failing to receive dental visits, routine pediatric visits, and subspecialty follow-up for various issues. 10 RP at 1747-50. From her assessment, Dr. Copeland concluded KC had experienced "significant and ongoing nutritional deprivation that likely compromised his maximum adult height." 10 RP at 1760-61. While KA was more preserved than KC, KA also showed significant and ongoing nutritional deprivation. KR, on the other hand, showed "significant and prolonged very, very, severe nutritional deprivation." 10 RP at 1762-63. Dr. Copeland described KR's presentation at death as "[t]he definition unfortunately of cachexia, . . . the severe wasting and loss of fat tissue, muscle breakdown." 10 RP at 1763. It was Dr. Copeland's opinion that KC and KA experienced failure to thrive while under the care of Adams and Franks.[7]

In April 2021, the medical examiner's office declared KR's cause of death as "[s]tarvation and neglect." 11 RP at 1957. The medical examiner's office publicly released KR's cause of death in a press release. The press release brought media into Adams and Franks' neighborhood. Mothers in the neighborhood also became hostile toward Adams and Franks. The night after the press release, a neighbor of Adams and Franks saw them pack up some things and drive away from their house. Adams and Franks drove to California.[8]

---

[7] Failure to thrive is a medical term for a child of any age whose nutrition is inadequate to maintain normal physical growth and development.

[8] Adams and Franks both lived in California for years prior to moving to Washington.

According to Adams, they left because she and Franks felt threatened after an incident where people surrounded them and their car and yelled threats and expletives at them. A woman chased after Adams and Franks' car when they began to drive away and slammed something into the trunk of their car. Once in California, Adams and Franks contacted an attorney to help them with dependency actions regarding KC and KA who advised them to "be safe, stay where you are, and let [the attorney] make some phone calls." 12 RP at 2082. About a month later, Adams and Franks' attorney told them that there was a warrant for their arrest. Adams and Franks turned themselves in to law enforcement in California.

The State charged Adams and Franks via amended information with one count of homicide by abuse and one count of felony murder, predicated on the crime of criminal mistreatment, for alleged actions causing KR's death. For both counts, the State alleged three aggravating circumstances: Adams' and Franks' actions manifested deliberate cruelty to KR, Adams and Franks knew or should have known that KR was particularly vulnerable or incapable of resistance, and Adams and Franks used their position of trust, confidence, or fiduciary responsibility to facilitate the crimes.

The State also charged Adams and Franks with two counts of second degree criminal mistreatment for alleged actions involving KA and KC. For these two counts, the State alleged additionally that Adams and Franks used their position of trust, confidence, or fiduciary responsibility to facilitate the crimes.

Adams and Franks proceeded to trial as codefendants.

Adams filed a motion in limine, requesting the trial court bar the State from admitting evidence of flight—specifically when Adams and Franks moved back to California after KR's

death. In responsive briefing, the State provided a description of the circumstances surrounding Adams and Franks' departure from Washington to California soon after there was a media release in the case. The State also noted that, by leaving the state, Adams and Franks forwent supervised visitation with KC and KA. The trial court determined the evidence "can be argued two ways," but "unless one of you can convince me otherwise, . . . it really goes to the weight the jury accords the evidence and not the admissibility." 3 RP at 151. The trial court ultimately denied Adams' motion, noting the evidence of flight was "highly relevant" and there was a longstanding history of case law allowing the admission of such evidence. 3 RP at 151.

The parties also briefly discussed Dr. Copeland's interviews of KA and KC. Adams "anticipate[d] a motion on [her] part arguing that Dr. Copeland's interview with the children should come in as evidence of medical record." 4 RP at 341. The State responded:

> I mean, some of the statements are clearly in the context of a medical setting . . . I think we'll also be trying to bring out certain statements under the same theory. So I think Defense would probably be entitled under that same evidentiary . . . argument . . . subject to—unless there's some other rule that they should be excluded for a reason.

4 RP at 341-42. The trial court stated, "It sounds like there's not a real issue as to the statements coming in for purposes of medical diagnosis," but decided that, if either side had an objection, they could raise such objection before Dr. Copeland's testimony. 4 RP at 342.

At trial, witnesses testified consistently with the facts above.

*Winegard's and Brothers' Testimony*

KR and KC's middle school bus driver, Rebecca Winegard, testified that, over the course of driving KR for two years, she observed KR and KC being irritated and unhappy on some

days. Almost every day, Winegard talked to Brothers, KR's teacher, to update him on how KR appeared to be doing.

Winegard recalled one day in particular when KC was grunting and punching the back of his seat in frustration. When the bus got to school, KC remained in his seat, crying, which was not "necessarily normal." 7 RP at 895. Adams objected on the basis of hearsay and the State responded that the statements were excited utterances and present sense impressions. The trial court allowed Winegard to testify that she asked KC what was wrong and KC told her:

> it had been a long three-day weekend and that [KC] was not able to eat over the weekend, that [Adams and Franks] had accused the kids of stealing food. And because they accused the kids of stealing food, none of the kids were allowed to eat over the weekend and [KC] was hungry.

7 RP at 900. Winegard shared KC's statement with somebody at the school.

Later, Brothers testified that, on one occasion, KR came to school crying and very upset. KR was unable to tell Brothers what was wrong and so Brothers went to talk with Winegard. The following exchange then occurred:

> I went out and [KR's] driver was still there, and I went and asked the driver, "Could you explain what he"—he was pounding the wall and he was yelling and he was yelling—like, he was yelling, "Apple. Apple." And we didn't know what was wrong. And she said that—

> [ADAMS]: Objection to hearsay.

> THE COURT: Overruled.

> [BROTHERS:] So she—she had told me that—that he had not had food over the weekend.

> [STATE]: Okay.

> [BROTHERS:] And that—that he was very, very hungry. That all of the boys had not had food over the weekend. They were being punished for something. And that

everybody was really, really hungry. And so I thanked her for that and went back and got him something to eat.

[STATE:] Okay. Was his brother [KC] on the bus with him at that point?

[BROTHERS:] Yes, he was.

[STATE:] Okay. And then with that information, did you notify CPS or the school counselor or something?

[BROTHERS:] Yes, I did.

[STATE:] Okay.

[BROTHERS:] The—the driver informed me that [KC] had told her. I went to the school counselors. They took it from there.

8 RP at 1170-71.[9]

*Testimony of KA, KC, and Dr. Copeland, and the Excluded Interview Recordings*

Prior to Dr. Copeland testifying, multiple witnesses testified, including KA, KC, their cousin, Adams' nephew, and hospital staff who examined KC and KA after CPS removed them from Adams and Franks' home.

KA, KC, and their cousin testified about Adams' and Franks' treatment of the boys, including the rules Adams and Franks had regarding food and how and why they punished them. *See supra* 3-6. KA and KC stated that Adams and Franks would provide them with three meals a day. KA and KC described Adams cooking them dinners every night, including dinners made with chicken, vegetables, and rice. However, according to their cousin, in order to get seconds, the boys had to ask Franks and Adams and, according to KC, they received half portions nearly every meal during the pandemic.

---

[9] Adams denied knowledge of or contact by a school counselor or CPS regarding KC's disclosure to Winegard that KC and his brothers went without food on a three-day weekend.

KA admitted that he lied to doctors, including Dr. Copeland, about what happened at home with Adams and Franks because he did not want his statements getting back to them and "ending up being in more trouble when [he got] home." 9 RP at 1617. KC did not remember seeing Dr. Copeland but stated that he did not make any complaints of being abused or not being fed right by Adams and Franks to the emergency room physician. The physician who examined KA and KC at the hospital reported that KC and KA told the physician that playing football had been the cause of any pain they had.

Dr. Copeland testified about her individual interviews with KC and KA in January 2021. Franks moved to introduce audio recordings of Dr. Copeland's interviews with KA and KC, which Adams joined. Just prior to Franks offering the recordings for admission, the following exchange occurred:

> [FRANKS]: [Dr. Copeland], you had testified that there were certain things that both [KA] and [KC] had told you during your examinations?
>
> [DR. COPELAND]: Yes.
>
> [FRANKS]: And what would you—would you describe those as interviews, or how would you describe when you're talking with one of the children?
>
> [DR. COPELAND]: I'm taking a medical history.
>
> [FRANKS]: Okay. A medical history. And so what they're telling you is part— is a statement for the purposes of medical diagnosis or treatment?
>
> [DR. COPELAND]: Yes.
>
> [FRANKS]: Okay. And you took these discussions with both [KA] and [KC] on January 4th?
>
> [DR. COPELAND]: Yes.

10 RP at 1777-78.

No. 59082-4-II

Franks and Adams argued that the interviews were admissible as inconsistent statements to KC and KA's testimony and statements made for medical treatment or diagnosis. Franks requested that the full audio recordings, about 35 to 40 minutes each, be played for the jury. When the State mentioned that transcripts of the interviews existed, Franks argued for the audio recordings to be admitted under the best evidence and completeness rules.[10]

The State objected based on relevance, "absent there being a more specific showing of relevance." 10 RP at 1779. The State also argued that there was a lack of foundation—whether the statements were made for medical treatment or diagnosis, arguing that KC's and KA's ability to provide reliable statements was compromised because they still had visitation with Adams and Franks.

When the trial court appraised Franks that they had not laid sufficient foundation for the medical diagnosis statements or "what you're specifically relying on in these 40-minute interviews," Adams noted that the recordings contained:

> places where essentially every kid—both kids say—they talk about the bruises and say, well, we played football on concrete. We played tackle football on concrete. We get fed everyday. There's some—they don't—there's some spanking and something like that. But it goes on and on about basically about they're not depressed.

10 RP at 1781. Adams also responded that Dr. Copeland relied on KC's and KA's statements in the interviews, in addition to relying on her exams and review of other records.

---

[10] Under the best evidence rule, generally the original recording is required to prove its contents. ER 1002; *State v. Clapp*, 67 Wn. App. 263, 272, 834 P.2d 1101 (1992). Under the rule of completeness, "[w]hen a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the party at that time to introduce any other part, or any other writing or recorded statement, which ought in fairness to be considered contemporaneously with it." ER 106; *State v. Simms*, 151 Wn. App. 677, 692, 214 P.3d 919 (2009).

Adams argued that the audio recordings would provide:

> what the kids actually said, to get the tone that they said it, and the circumstances they said it.
>     I mean, they're saying things that were not supportive of the State's theory when they were interviewed. They said they got fed. They got bruises from concrete. They got spanked. There wasn't any problem. And of course they said they lied to the doctor.
>     But I think how—what was said and what she's relied on is important for us to proceed with the theory of the defense and show the house of cards in the State's evidence.

10 RP at 1785.

The trial court questioned whether there were "specific statements the kids made that [Dr. Copeland] relied on that they weren't truthful about, that they've now said they lied" and noted that those statements could be relevant. 10 RP at 1785. Adams responded that they needed to show what Dr. Copeland failed to rely on or "failed to give a credence to when [the boys were] saying they were not starved." 10 RP at 1786. The trial court noted that the boys had already testified and denied not being provided nutrition. The trial court also stated that Adams and Franks were permitted to ask Dr. Copeland about such statements.

The trial court excluded the audio recordings, concluding that Franks and Adams did not make "an adequate foundation" for the recordings. 10 RP at 1786. The trial court told Adams and Franks that they could raise the issue again at the end of the day "if there's still an issue." 10 RP at 1786. Neither Adams nor Franks raised the issue at the end of the day; however, after the jury returned a verdict, Adams moved for a new trial or arrest of judgment based, in part, on the exclusion of the recordings.

In the excluded audio recordings, the boys reported that they typically had three meals a day. They described how they got their own breakfasts on the weekdays, usually cereal and

oatmeal. On weekends, Adams made them eggs, bacon, sausage, hash browns, biscuits and gravy, and breakfast burritos. For lunch, the boys had pizza, ramen noodles, and food provided by their school.[11] KC stated that the boys had to get their own lunch. For dinner, Adams made the boys "all kinds of stuff," including biscuits. Ex. D385, 19:53-19:58. If there was enough food remaining, which happened frequently, the boys could have seconds. KC stated that they could only get food at these three meals though.

In the recordings, KA reported being hungry "probably two days" of each week. Ex. D385, 21:18-21:24. During those days, the boys could ask Adams and Franks for "healthy stuff" to eat. Ex. D385, 21:26-21:45. Both boys stated that food was never locked up inside the house, but the boys had to ask before getting food.[12] KA believed that Adams and Franks did not let the boys get food whenever they wanted because Adams and Franks wanted to track how much of the food remained in case they wanted it for themselves. KA did not believe that Adams and Frank's requirement that the boys ask before getting food was because it was hard for Adams and Franks to get food.

In the recordings, KA and KC both told Dr. Copeland that, if they took food without asking, they would get spanked. Adams and Franks spanked them with a wooden paddle or a leather belt to the point of causing bruises on their behinds and back of their legs. KA told Dr. Copeland that he also got bruises from falling down a lot and "sometimes being a little rough"

---

[11] KA and KC told Dr. Copeland that KC was homeschooled in fifth grade due to his behavior at school, but, other than because of COVID-19, KR and KA attended school in-person.

[12] In the recording, KA also reported that food was locked up in the garage because an older cousin used to take food from the garage before school. KC and KA were not prohibited from accessing the garage though.

like when he would play football and tackle people on concrete. CP at 907. Both boys stated that KR would not get spanked. Adams and Franks spanked KC about twice a month, including for times when KC would "steal" food because he did not ask Adams or Franks for it. Ex. D386, 12:15-12:26, 13:10-13:21. KC took food at night because he was hungry "and [he] just need[ed] to go to sleep." Ex. D386, 22:50-23:01. He felt hungry "half the time." Ex. D386, 23:17-23:23.

In the recording of his interview with Dr. Copeland, KA recalled Adams and Franks locked the boys in their room every night as punishment about a month before social workers arrived at the house. Adams and Franks put the locks on the outside of KC and KA's door because they used to "steal" things from the house such as sweets. Ex. D385, 23:19-23:39. They had been stealing sweets because, when the boys asked for more food at night, Adams and Franks only gave them healthy food, which the boys did not want.

In the recordings, both KC and KA reported that they had never felt depressed. They also stated that, since the social worker had removed KC and KA from Adams and Franks' house, they had not seen Adams and Franks. Both boys felt upset about not seeing Adams and Franks and wanted to see them.

After the trial court excluded the recordings of the interviews, defense counsel questioned Dr. Copeland about what KA and KC said during the interviews, including food Adams provided them, the physical punishments KA and KC received, that both denied food ever being locked up, and that KA reported sometimes falling down on concrete while playing football which gave him bruises. During Adams' questioning of Dr. Copeland, Adams moved to admit transcripts of the interviews. The State objected on the basis of relevance and the trial court sustained the objection. Adams proceeded to question Dr. Copeland by referencing the interview transcripts.

*Defense's Closing Arguments*

In closing arguments, defense counsel made a variety of arguments in Adams' defense. Among other things, defense counsel argued that the State failed to prove that Adams caused KR's death or that her actions amounted to a pattern and practice of torturing KR. Counsel also argued that the State failed to prove that Adams caused imminent and substantial risk of death or great bodily injury to KA and KC. Defense counsel contended that, even though KA and KC claimed that they did not have continuous access to food and they were physically disciplined, those were not necessarily outside the scope of legal parental discipline nor a basis to conclude that they were in imminent and substantial risk of bodily harm.

Defense counsel also attacked multiple witnesses' credibility, such as that of Adams' sister due to inconsistent testimony and her prior criminal record, and that of medical experts due to their reliance on allegedly faulty assumptions, theories, or calculations. Counsel attacked Dr. Copeland's credibility by arguing that she was biased toward convictions. Counsel also attacked KA's and KC's credibility arguing that they had a financial interest in the case due to a pending tort claim and civil case.

Counsel argued that because Adams did not bathe or dress KR, she did not know that he was too thin and, when she did notice, Adams tried to bring KR to the doctor, but she just could not get him there in time. Defense counsel also noted that Adams suffered from very serious medical problems at the time which caused her to be less attentive and limited her energy to deal with KR's needs.

No. 59082-4-II

*Verdict, Sentencing, & Post-Trial Motions*

The jury found Adams guilty of one count of homicide by abuse, one count of felony murder, and two counts of second degree criminal mistreatment, all committed against members of Adams' family or household. The jury entered special verdicts for the crimes of homicide by abuse and second degree murder, finding aggravating factors of deliberate cruelty, particular vulnerability, and abuse of trust for both crimes. The jury also entered special verdicts for the two counts of criminal mistreatment, finding the aggravating factor of abuse of trust.

Prior to sentencing, Adams moved for a new trial or arrest of judgment arguing, among other grounds, that the State provided insufficient evidence to support the homicide by abuse conviction and that exclusion of Dr. Copeland's recorded interviews with KA and KC violated Adams' right to present a defense. The trial court denied Adams' motion and clarified that its decision to exclude the recording of Dr. Copeland's interviews was because the proffered evidence was cumulative.

At sentencing, the trial court vacated the second degree murder count to avoid a double jeopardy violation. Based on the aggravating circumstances found by the jury for the three remaining counts, the trial court concluded that "[t]here [were] substantial and compelling reasons to impose an exceptional sentence." CP at 973. The trial court sentenced Adams to 420 months of total confinement and 36 months of community custody.

Adams appeals.

No. 59082-4-II

## ANALYSIS

### I. SUFFICIENCY OF THE EVIDENCE

Adams argues insufficient evidence supported her homicide by abuse conviction. Specifically, Adams claims that the State failed to prove the necessary mens rea for the crime: that Adams acted with "extreme indifference to human life." Br. of Appellant at 28. We disagree.

A.      *Legal Principles*

The state and federal due process clauses require the State to prove "'every fact necessary to constitute the crime with which [the accused] is charged'" beyond a reasonable doubt. *State v. Roberts*, 5 Wn.3d 222, 231, 572 P.3d 1191 (2025) (alterations in original) (quoting *In re Winship*, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970)); *see* U.S. CONST. amend XIV; WASH. CONST. art. I, § 3. Therefore, we review the sufficiency of the evidence de novo as a question of constitutional law. *State v. Zghair*, 4 Wn.3d 610, 619, 567 P.3d 1 (2025).

To determine whether sufficient evidence supports a conviction, we inquire if, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.* at 619-20; *Jackson v. Virginia*, 443 U.S. 307, 318-19, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979). We do not resolve conflicting testimony, weigh evidence, or substitute our judgment for that of the jury. *Zghair*, 4 Wn.3d at 620. Nor are credibility determinations subject to our review. *Id*.

"A claim of insufficiency admits the truth of the State's evidence and all inferences that reasonably can be drawn therefrom." *State v. Salinas*, 119 Wn.2d 193, 201, 829 P.2d 1068 (1992). We consider circumstantial and direct evidence as equally reliable. *State v. Delmarter*,

94 Wn.2d 634, 638, 618 P.2d 99 (1980) ("In determining the sufficiency of the evidence, circumstantial evidence is not to be considered any less reliable than direct evidence."). However, "inferences based on circumstantial evidence must be reasonable and cannot be based on speculation." *State v. Vasquez*, 178 Wn.2d 1, 16, 309 P.3d 318 (2013).

B.     *Sufficient Evidence Supported Adams' Homicide by Abuse Conviction*

Under RCW 9A.32.055, a person is guilty of homicide by abuse "if, *under circumstances manifesting an extreme indifference to human life*, the person causes the death of a . . . person under sixteen years of age . . . and the person has previously engaged in a pattern or practice of assault or torture of said . . . person under sixteen years of age." (Emphasis added.)  The statute does not define "extreme indifference to human life."

Preliminarily, the parties dispute the meaning of "extreme indifference" for the purposes of the crime of homicide by abuse.  Adams argues that "extreme indifference" is an aggravated form of recklessness and, thus, requires the State to prove that she engaged in "extremely reckless conduct that create[d] a grave risk of death" like first degree murder cases.  Br. of Appellant at 31 (quoting *State v. Adams*, 138 Wn. App. 36, 50, 155 P.3d 989 (2007)).  The State responds that, consistent with our prior opinion in *State v. Madarash*, 116 Wn. App. 500, 66 P.3d 682 (2003), the State only has to show that Adams did not care whether KR lived or died.

In *Madarash*, we considered the meaning of "extreme indifference" as used in the homicide by abuse statute and, like the argument Adams raises here, whether the phrase requires a showing of "recklessness."  *Id.* at 510-511.  We first considered a case from Division One that had held that the definition of this phrase as it is used in the first degree murder statute did not apply in homicide by abuse cases.  *Id.* at 511 (examining *State v. Edwards*, 92 Wn. App. 156,

961 P.2d 969 (1998)). Next, we noted that the first degree murder statute specifically incorporates the language, "conduct which creates a grave risk of death," while the homicide by abuse statute does not. *Id*. at 512 (citing to RCW 9A.32.030(1)(b)). Because the homicide by abuse statute provided no definition for "extreme indifference," we considered the ordinary meaning of that phrase as defined in a dictionary:

> According to Webster's, the word "extreme" means "existing in the highest or the greatest possible degree; very great; very intense." The word "indifference" means "the quality or state of being indifferent." "Indifferent" means "looked upon as not mattering one way or another," or "regarded as being of no significant importance or value."

*Id.* (internal citations omitted) (citing WEBSTER'S THIRD NEW INT'L DICTIONARY 807, 1151 (1969)).

Ultimately, we declined to adopt a recklessness standard for the meaning of "extreme indifference" in homicide by abuse cases. *Id*. Instead, we held that a defendant does not need to know nor understand the physiological response or any other results of their acts against the victim. *Id*. "Rather, in order to have acted with extreme indifference to [the victim]'s life, [the defendant] simply had to not care whether [the victim] lived or died." *Id*.

Adams asks us to disavow *Madarash*. We find the reasoning of *Madarash* sound and decline Adams' request to depart from our holding in that case.

Applying *Madarash* and viewing the evidence in the light most favorable to the State, evidence in the record supports the conclusion that Adams did not care whether KR lived or died in the last few months leading up to KR's death. In the matter of a year and a half, KR lost nearly half his body weight. In the last four months of KR's life, Adams restricted KR's access to food by either not feeding him or only allowing him to have half portions, taking food away

from him if he ate too quickly, and yelling at and hitting him if he began to regurgitate his food. This continued despite Adams being at home during this time and many family members observing KR degrade to the point where he could not walk and had trouble getting up.

Adams appears to argue that she was not aware that KR was weak or had lost weight in the weeks preceding his death because Adams' nephew did not think KR was dangerously thin, the CPS social worker did not remove the boys from the home upon seeing KR six days before he died, and Adams was not responsible for bathing KR. However, KA testified that Adams knew KR was getting skinny and, at some point, Adams told Franks that she would take the "blame" if anything happened to KR. 9 RP at 1572. And we must accept this as true and not engage in reweighing the evidence or resolving conflicting testimony on appeal. *Salinas*, 119 Wn.2d at 201; *Zghair*, 4 Wn.3d at 620.

While Adams' nephew did not appear concerned by KR's appearance, he still observed KR getting skinnier over time and noticed KR having trouble standing up, which Adams could have observed without needing to bathe KR. *See* 8 RP at 1377-79. Even KR's teacher noticed that KR looked different, including that his cheeks appeared sunken in and his head appeared large, and that KR had become less interactive. When Adams' sister visited the home, Adams' sister was so alarmed by KR's appearance that she called CPS. Although CPS did not remove KR from the home then, other evidence in the record indicated that Adams knew KR's health was declining.

Despite KR's decline, which Adams knew about and had discussed with Franks, Adams continued to withhold food from KR as punishment and had threatened KR that he would not eat if he did not get up to eat. While Adams testified that she eventually made a doctor's

appointment for KR, the appointment had to be rescheduled due to a conflict with her schedule and never occurred because KR died before the rescheduled appointment. A rational juror could have inferred that, because Adams continued to withhold food from KR in his declining state and she was not more proactive or responsive in getting KR medical care during this time, Adams did not truly care about whether KR lived or died.

When KC woke up to find KR appearing unresponsive, Adams carried KR into the bath. While in the bathroom, KR's heart appeared to stop multiple times before Adams carried him into the car and Adams drove him to the hospital. When Adams arrived at the hospital, she reportedly told the emergency room doctor that she stopped "at length" on her way to the hospital and hospital staff observed that her car was playing loud music. 6 RP at 788. This behavior as well as KR's appearance compelled the emergency room physician to initiate a report to CPS. After KR was declared dead, Adams visited a casino mere hours later and then again later that night. Although these events occurred after KR's death, a fair-minded juror could have reasonably inferred Adams' behavior bringing KR to the hospital and afterwards provided additional support of Adams' state of mind in her actions leading up to KR's death. *See Vasquez*, 178 Wn.2d at 16; *see also Madarash*, 116 Wn. App. at 513 (including the defendant's presentation and statements after taking their child to the hospital as evidence supporting a finding of manifested extreme indifference).

This was sufficient evidence for the jury to conclude that Adams did not care whether KR lived or died and, thus, Adams manifested an extreme indifference to human life in her actions leading to KR's death. Even if the standard for proving an extreme indifference required the State to show that Adams acted with extreme recklessness that created a grave risk of death, the

No. 59082-4-II

evidence here was sufficient to support Adams' homicide by abuse conviction. Accordingly, Adams' claim fails.

## II. RIGHT TO PRESENT A DEFENSE

Adams argues that reversal is required because the trial court violated Adams' constitutional right to present a defense by excluding the audio recordings and transcript from Dr. Copeland's interview with KA and KC. We disagree.

### A.       *Legal Principles*

Under the state and federal constitutions, criminal defendants have a constitutional right to present a defense. U.S. CONST. amend. VI; WASH. CONST. art. 1, § 22; *State v. Restvedt*, 26 Wn. App. 2d 102, 123, 527 P.3d 171 (2023). However, a defendant's constitutional right to present a defense "is not absolute." *Restvedt*, 26 Wn. App. 2d at 123; *see also State v. Arndt*, 194 Wn.2d 784, 812, 453 P.3d 696 (2019).

We apply a two-part test when determining whether a defendant's Sixth Amendment right to present a defense has been violated by an evidentiary ruling. *Restvedt*, 26 Wn. App. 2d at 123 (citing to *State v. Jennings*, 199 Wn.2d 53, 58, 502 P.3d 1255 (2022)). First, we review the trial court's evidentiary ruling for an abuse of discretion. *Restvedt*, 26 Wn. App. 2d at 123. Even if the trial court's evidentiary ruling was proper, we next consider de novo the constitutional question of whether the ruling deprived the defendant of their right to present a defense. *Id*.

### B.       *The Trial Court Did Not Abuse Its Discretion in Excluding the Audio Recordings and Any Error in Excluding the Transcripts Was Harmless*

Adams argues that the trial court abused its discretion by excluding the audio recordings and transcripts of Dr. Copeland's interviews because they were admissible as statements made

for medical treatment or diagnosis as permitted by ER 803(a)(4).[13] We disagree that the trial

court abused its discretion here because, even if the recordings were relevant and admissible

under ER 803, a reasonable court could have concluded, as the trial court did, that the evidence

should be excluded due to its cumulativeness.

As discussed above, we review a trial court's evidentiary decisions for an abuse of

discretion. *Id*. A trial court abuses its discretion if it either adopts a view that no reasonable

person would take, bases its decision on facts unsupported in the record, or applies an incorrect

legal standard in making its determination. *State v. Sisouvanh*, 175 Wn.2d 607, 623, 290 P.3d

942 (2012).

1.      *The Probative Value of the Recordings Was Substantially Outweighed By Other Cumulative Evidence*

Irrelevant evidence is not admissible. ER 402. Evidence is "relevant" if it has any

tendency to make the existence of any fact that is of consequence to the determination of the

action more probable or less probable than it would be without the evidence. ER 401. Even if

evidence is relevant, such evidence's admissibility may be limited by a constitutional

requirement, statute, or rule of evidence. ER 402. Under ER 403, a trial court may exclude even

relevant evidence "if its probative value is substantially outweighed . . . by considerations of

undue delay, waste of time, or needless presentation of cumulative evidence."

Here, Franks and Adams sought to introduce and play for the jury the entirety of each 35

to 40 minute interview recording. In colloquy with parties about their proffer, the trial court

---

[13] ER 803(a)(4) provides an exception for otherwise inadmissible hearsay statements if such statements are made for the purposes of medical diagnosis or treatment. *State v. Burke*, 196 Wn.2d 712, 740, 478 P.3d 1096 (2021).

appeared to question the probative value of the recordings when KA and KC had already testified to the content that Franks and Adams argued was relevant to the case. In their arguments before the trial court, Adams argued that the recordings would provide "what the kids actually said, to get the tone they said it, and the circumstances they said it." 10 RP at 1785. Adams listed the following statements in the interviews as important to their case: statements from both boys that they were fed everyday, that they got bruises from playing football on concrete, that they got spanked, and that "there wasn't any problem," they were not depressed, and they were not starved. 10 RP at 1785.

However, prior to offering admission of the audio recordings, witnesses had already testified to many of these facts. Both KA and KC testified that Adams and Franks would provide them with three meals a day and that Adams would cook them dinners, including meals with chicken, vegetables, and rice. KA and his cousin testified that they were able to get snacks, however, they would have to ask Franks and Adams to receive them. According to the cousin, this rule also applied to getting seconds at meals.

The boys also generally testified to Adams and Franks' treatment of them, including how they punished them. *See supra* 3-6. They specifically mentioned that they would either be spanked with a belt, paddle, or extension cord and that the spanking would leave marks on the boys. When the physician who examined KA and KC after CPS' removal testified, they stated that KA and KC told them that any pain they had was caused by playing football. According to KC and KA's own testimony, KA lied to doctors about what happened at Franks and Adams' home because he did not want to get in trouble if they found out about his statements and KC

never told the hospital physician that Adams and Franks abused him or denied them adequate food.

Although the trial court decided to exclude the recordings for insufficient "foundation," it later clarified its ruling and stated that the recordings were cumulative.  Pursuant to ER 403, the trial court had the discretion to exclude even relevant and otherwise admissible evidence if it concluded that the probative value of the evidence was substantially outweighed by a needless presentation of cumulative evidence.  Despite requesting the admission of the entire recordings, most of the content Adams identified as relevant in the recordings was evidence already admitted through the testimony of other witnesses prior to offering admission of the audio recordings.  The only details that were not yet testified to prior to proffering the recordings were whether the boys felt depressed at the time of their interview with Dr. Copeland and whether they told Dr. Copeland that playing football on concrete gave the boys *bruises* as opposed to being the cause of pain.  Given the information that the trial court had regarding the contents of the recordings, the trial court could have reasonably concluded that the probative value of the entire audio recordings—even with there not yet being admitted evidence concerning whether KC and KA were depressed at the time of Dr. Copeland's interviews or whether the boys had received bruises from playing football—was substantially outweighed by what would be a needless presentation of otherwise cumulative evidence.

2. *Any Error Was Harmless*

Even if the trial court had abused its discretion in excluding the recordings, including later excluding the transcripts, any evidentiary error would have been harmless.  An evidentiary error is not grounds for reversal unless it "result[s] in prejudice to the defendant." *State v.*

*Bourgeois*, 133 Wn.2d 389, 403, 945 P.2d 1120 (1997). An evidentiary error is not prejudicial unless it is reasonably probable that, absent the error, the outcome of the trial would have been materially affected. *State v. Barry*, 183 Wn.2d 297, 303, 352 P.3d 161 (2015).

Adams argues that the jury would not have convicted her if it had heard the boys telling Dr. Copeland about how they were treated. Specifically, Adams argues that the boys' statements that they received three meals per day and usually got seconds as well as describing numerous dishes Adams made them countered the State's theory that Adams withheld food from them. However, as Adams acknowledges in her briefing on appeal, defense was able to elicit the boys' statements through cross-examining Dr. Copeland. Accordingly, the information Adams sought was ultimately admitted. Moreover, given significant other evidence, including physical evidence, admitted in the case, it is not within reasonable probabilities that reading the context of the boys' already-admitted statements through a transcript or listening to their statements would have materially affected the outcome of the case. *See State v. Aguilar*, 153 Wn. App. 265, 275, 223 P.3d 1158 (2009) (holding that exclusion of certain testimony was harmless when the information sought was ultimately admitted).

Thus, the trial court did not abuse its discretion in excluding the audio recordings based on cumulativeness. Accordingly, we hold that the trial court did not abuse its discretion in excluding the audio recordings. Additionally, even if the trial court abused its discretion in later excluding transcripts of the interviews, any error was harmless.

C.       *Exclusion of the Recordings Did Not Violate Adams' Right to Present a Defense*

Adams argues that the trial court violated her right to present a defense because it excluded evidence that was highly relevant in providing evidence of "numerous meals [] Adams

regularly provided them," evidence that KA and KC missed Adams and Franks, and evidence that, at the time when the boys made these statements, they "sounded calm, content, and well-adjusted." Br. of Appellant at 54. Adams asserts that, although the defense was able to cross-examine Dr. Copeland about the boys' statements in the interviews, her testimony was inadequate compared to the audio recordings in impeaching KA and KC. We disagree.

A defendant does not have the right to present evidence that is not relevant. *State v. Orn*, 197 Wn.2d 343, 352, 482 P.3d 913 (2021). Additionally, it is permissible, under the Constitution, for judges to "'exclude evidence that is repetitive . . ., only marginally relevant or poses an undue risk of harassment, prejudice, [or] confusion of the issues.'" *Jennings*, 199 Wn.2d at 63 (quoting *Holmes v. South Carolina*, 547 U.S. 319, 326-27, 126 S. Ct. 1727, 164 L. Ed. 2d 503 (2006)) (internal quotations omitted); *see* ER 403.

To determine whether the exclusion of relevant evidence violates a defendant's constitutional rights, "the reviewing court must weigh the defendant's right to produce relevant evidence against the State's interest in limiting the prejudicial effects of that evidence." *Jennings*, 199 Wn.2d at 63. In cases where evidence of "high probative value" is excluded, no State interest is compelling enough to prevent a violation. *State v. Hudlow*, 99 Wn.2d 1, 16, 659 P.2d 514 (1983).

First, Adams fails to show that the recordings were of "high probative value" when the contents Adams points to as relevant were cumulative with evidence already presented at trial. Adams argues that the recordings included highly relevant evidence because they included the following statements by KA and KC: descriptions of meals Adams made them; that they were fed three meals per day, served seconds, and healthy snacks; and that Adams hired her nephew to

care for KR. However, as discussed above, multiple witnesses had already testified to these facts prior to Franks and Adams proffering the recordings, including KA and KC themselves.

Additionally, the trial court did not comprehensively bar Adams from eliciting KA's and KC's statements from the interviews. The trial court permitted Franks and Adams to ask Dr. Copeland about KA's and KC's statements made during the interviews as well as raise the issue again at the end of the trial day if defense still had an issue with the recordings' exclusion. Adams did not re-raise the recording exclusion issue with the trial court at the end of the trial day. Instead, both Franks and Adams had Dr. Copeland testify to KA's and KC's statements in the interviews, including Adams' and Franks' treatment of them and the cause of some bruises. Adams re-raised the issue in a motion for a new trial only after the jury returned its verdicts.

Adams argues that admitting the statements through Dr. Copeland was inadequate to presenting her defense because "this acknowledgement by a third party for impeachment purposes is a far cry from presenting substantive evidence of innocence from the mouths of the complaining witnesses themselves." Br. of Appellant at 57. She asserts that listening to the audio recordings would have left the jury with "the impression that the children were generally well-treated and well cared for" due to their calm demeanor and tone, thus demonstrating that the boys lied in court instead of during their interview. Br. of Appellant at 57. While the jury was unable to hear KA's and KC's tones through the audio recordings, Adams still had an opportunity to attack, and did attack, the boys' credibility in other ways through cross-examining each of them and through admitting their statements from the interviews through Dr. Copeland. Ultimately, through the defense's attacks on the boys' credibility, the jury could make the credibility determination Adams desired.

None of the cases Adams relies on in arguing that a constitutional violation occurred, *State v. Broussard*, 25 Wn. App. 2d 781, 525 P.3d 615 (2023), *State v. Duarte Vela*, 200 Wn. App. 306, 402 P.3d 281 (2017), or *State v. Jones*, 168 Wn.2d 713, 230 P.3d 576 (2010), addresses situations involving cumulative evidence or where parties could cross-examine witnesses about the exact statements they sought to introduce through recordings. Additionally, the facts of those cases are distinguishable from those here.

*Broussard* concerned the exclusion of a witness entirely from trial who would have allowed the defendant to rebut one of the State's theories of the case. 25 Wn. App. 2d at 789, 793. The case also "hinged entirely on witness credibility" and the witness was the only impeachment witness available to the defendant. *Id*. *Duarte Vela* involved the exclusion of "highly probative" specific testimony from multiple witnesses, including the defendant, and the exclusions precluded the defendant from presenting a legal defense to a killing he admitted to doing. 200 Wn. App. at 326-27. In both cases, divisions of this court reversed: in *Broussard*, because the trial court abused its discretion and the evidentiary error was not harmless, and, in *Duarte Vela*, because the trial court's evidentiary rulings violated the defendant's constitutional right to present a defense. *Broussard*, 25 Wn. App. 2d at 793-94; *Duarte Vela*, 200 Wn. App. at 327.

In *Jones*, the trial court barred the defendant from presenting his own "extremely high probative value" testimony that the victim in a sex-crime case consented or cross-examining the victim witness about the issue of consent. 168 Wn.2d at 718, 721. The evidence of consent constituted Jones' entire defense. *Id.* at 721. Our supreme court held that barring such testimony

violated Jones' constitutional right to present a defense and reversed upon concluding that the error "prevented Jones from presenting his version of the events." *Id.* at 724-25.

Here, unlike in *Broussard*, the State's case did not depend solely on witness credibility. The State presented physical evidence, and Adams was able to impeach KA and KC through cross-examining each of the boys as well as introducing their statements through Dr. Copeland's testimony. Unlike in *Duarte Vela* and *Jones*, the proffered evidence was not of "high probative" value due to cumulativeness, as discussed above. Additionally, Adams' inability to admit recordings of the interviews did not completely prevent Adams from presenting a certain defense. Distinct from *Jones*, attacking KA and KC's credibility was not Adams' entire defense. While the trial court limited how Adams could admit KA and KC's statements from the interviews, Adams was still able to elicit testimony consistent with the content of the recordings and attack KA and KC's credibility. Moreover, the defense was able to raise a variety of attacks on the State's theory of the case, including attacks on expert witnesses. Further, Adams argued that the State failed to prove that Adams caused imminent and substantial risk of death or great bodily injury to KA and KC.

Because attacking KA's and KC's credibility was not Adams' entire defense, Adams was able to attack the boys' credibility in other ways, and the content of the interviews was ultimately admitted, we conclude that no constitutional violation occurred. *See Restvedt*, 26 Wn. App. 2d at 126 (holding that no constitutional violation occurred when the defendant's defense did not hinge on the evidence sought, he was able to attack a witness's credibility though other means, and the evidence sought was ultimately admitted).

In sum, we hold that the trial court did not abuse its discretion in excluding the audio recordings of Dr. Copeland's interviews with KA and KC based on cumulativeness and any error in excluding transcripts of the interviews was harmless. Additionally, despite restricting Adams from presenting recordings of the interviews, the trial court did not deprive Adams of her Sixth Amendment right to present a defense.

### III. ADMISSION OF HEARSAY

Adams argues that the trial court abused its discretion by permitting KC's bus driver and KR's teacher to testify about KC's statements to his bus driver that he was hungry and the boys had not eaten over the weekend. Adams asserts that the statements were hearsay, no exception applied to all the layers of hearsay, and the alleged errors were not harmless. We conclude any error was harmless.

We review a trial court's decision to admit or exclude evidence for abuse of discretion. *State v. Otton*, 185 Wn.2d 673, 678, 374 P.3d 1108 (2016). If the trial court abused its discretion in making an evidentiary decision, we then review the error for prejudice to determine whether it was reasonably probable, absent the error, that the outcome of the trial would have been materially affected. *Barry*, 183 Wn.2d at 303. An error in admitting evidence constitutes harmless error if the evidence "is of minor significance in reference to the overall, overwhelming evidence as a whole." *Bourgeois*, 133 Wn.2d at 403. In determining whether an evidentiary error was harmless, we measure the admissible evidence of guilt against any prejudice caused by the inadmissible testimony. *Id.* at 404.

We discuss the elements of the crime of homicide by abuse above. *See* I.B. *supra*; RCW 9A.32.055. In order to prove that Adams was guilty of second degree criminal mistreatment, the

State had to prove, beyond a reasonable doubt, (1) that Adams was entrusted with the physical custody of KA and KC and (2), with criminal negligence, either created "an imminent and substantial risk of death or great bodily harm by withholding any of the basic necessities of life, or . . . cause[d] substantial bodily harm by withholding any of [those] necessities." RCW 9A.42.030(1)(a-b). A person acts with criminal negligence if they "fail[] to be aware of a substantial risk that a wrongful act may occur and his or her failure to be aware of such substantial risk constitutes a gross deviation from the standard of care that a reasonable person would exercise in the same situation." RCW 9A.08.010(1)(d).

Winegard, KC's bus driver, testified that one day she observed KC grunting, punching the back of his seat on the bus, and crying which prompted her to ask him what was wrong. KC told Winegard that he was hungry and that the three brothers had not eaten over a three-day weekend. Later in trial, Brothers, KR's teacher, testified that he observed KR arriving to school crying and yelling for an apple and asked Winegard if she knew what was wrong. Winegard told Brothers what KC had told her on the bus.

Even if we assume, without deciding, that the trial court erred in admitting both Winegard and Brothers' testimony, in light of the evidence as a whole, any error was harmless. Winegard's and Brothers' challenged testimony only provided evidence that, for a three-day weekend, KC and the brothers had not eaten and that this caused KC to appear in distress. However, multiple witnesses testified that Adams and Franks restricted the boys' food, sometimes for days. KC even testified that once he had to go a week without food as punishment. Multiple witnesses observed all three boys appearing extremely thin prior to KR's death, one medical expert found that KC and KA were underweight and at risk of lacking

adequate care and protection, and another found that both boys had suffered significant nutritional deprivation.

After KC and KA were removed from Adams and Franks' home, they experienced significant gains in weight—nearly 66 pounds for KC over 19 months and 64 pounds for KA over two years. KA also grew six inches over those two years. When KR died, he had lost nearly half his body weight in the prior year-and-a-half. And it was undisputed the Adams was the adoptive parent of KA and KC. Considering the significant admissible evidence of guilt, any prejudice caused by Winegard's and Brothers' testimony, if it were inadmissible, was minimal in light of the other evidence. *Bourgeois*, 133 Wn.2d at 404.

Therefore, even if the trial court erroneously admitted Winegard's and Brothers' testimony of KC's statements, we conclude that it is not reasonably probable that the outcome of the trial would have been materially affected had they not testified. Adams' claim fails.

IV. ADMISSION OF EVIDENCE OF FLIGHT

Adams argues that the trial court abused its discretion in admitting evidence of flight. We disagree.

Since English common law, evidence of flight has been admissible to show consciousness of guilt. *State v. Slater*, 197 Wn.2d 660, 667, 486 P.3d 873 (2021). Such evidence may be considered by the jury as one circumstance, along with others, in determining guilt or innocence. *Id.* at 668. When evidence of flight is proffered, a trial court "must decide whether or not the alleged evidence amounts to flight that supports a consciousness of guilt inference." *Id.* at 670. If the evidence does, it may be admitted for consideration by the jury. *Id.*

In *State v. Bruton*, we discussed when circumstances or inferences amount to "flight":

> The law makes no nice or refined distinctions as to the manner or mode of flight, and the range of circumstances which may be shown as evidence of flight is broad. However, the circumstance or inference of flight must be substantial and real. It may not be speculative, conjectural, or fanciful. In other words, the evidence or circumstances introduced and giving rise to the contention of flight must be substantial and sufficient to create a reasonable and substantive inference that the defendant's departure from the scene of difficulty was an instinctive or impulsive reaction to a consciousness of guilt or was a deliberate effort to evade arrest and prosecution. Pyramiding vague inference upon vague inference will not supplant the absence of basic facts or circumstances from which the essential inference of an actual flight must be drawn.

66 Wn.2d 111, 112-13, 401 P.2d 340 (1965). Courts have accepted evidence of flight when "the defendant flees the scene of the crime, escapes police contact, travels to a different state, or evades arrest for a significant period of time." *Slater*, 197 Wn.2d at 669-70 (listing cases).

Adams argues that her and Franks' return to California was not an act of flight and, thus, did not support admitting evidence of their move. She specifically argues that the circumstances surrounding her move to California did not create "'a reasonable and substantive inference that [her] departure from the scene was an instinctive or impulsive reaction to a consciousness of guilt or was a deliberate effort to evade arrest and prosecution.'" Reply Br. at 28-29 (quoting *State v. Freeburg*, 105 Wn. App. 492, 497, 20 P.3d 984 (2001)). She relies on *Slater* as support.

In *Slater*, our supreme court held that a trial court abused its discretion in admitting evidence of flight based on a single failure to appear. 197 Wn.2d at 674. Slater had attended all prior court dates but missed the day when his case was called for trial. *Id.* at 664. The trial court issued a bench warrant and, a month later, Slater appeared in court to quash the warrant. *Id.* at 666. Distinguishing from other cases where a failure to appear is accompanied by additional evidence of avoiding prosecution, the supreme court held that a single failure to appear, without

more, cannot amount to evidence of flight. *Id.* at 673-74. The Court reasoned that, without facts beyond missing a single trial call, it was pure speculation to infer that his failure to appear was flight to flee prosecution showing consciousness of guilt. *Id.* at 674.

The facts underlying Adams and Franks' circumstances are distinguishable from those in *Slater*. Unlike in *Slater*, the State did not rely just on a failure to appear to present circumstances supporting evidence of flight. Instead the State argued that the timing of Adams and Franks' departure from the state as well as the fact that, by fleeing, they forewent supervised visitation with KC and KA supported an inference of consciousness of guilt. Therefore, unlike the trial court in *Slater*, here the trial court did not rely on mere speculation for deciding whether evidence of flight should be admitted. The State pointed to "substantial and real" circumstances inferring that Adams and Franks were fleeing arrest and prosecution. The trial court even noted in its decision that it was presented with "two ways" to view the evidence, evidencing that the court was not relying on mere speculation, conjecture, or fancifulness in making its decision. 3 RP at 151; *see Bruton*, 66 Wn.2d at 112 ("[T]he circumstance or inference of flight must be substantial and real. It may not be speculative, conjectural, or fanciful.").

As we review the trial court's decision to admit this evidence for an abuse of discretion, we consider whether the trial court, in making its decision to admit the evidence of flight, adopted a view no reasonable person would take. *Sisouvanh*, 175 Wn.2d at 623. Considering the circumstances surrounding Adams and Franks' departure, we cannot conclude that it did.

Adams and Franks left their home relatively soon after the medical examiner's office publicly released KR's cause of death in a press release. Although Adams and Franks' departure could have been in response to media presence outside of their home as well as being approached

and threatened by people outside, a reasonable person could have, in contrast, viewed their departure as an indicator of their consciousness of guilt. Quickly leaving their home to move to a different state in a way that forewent visitation with their two adoptive sons, created a reasonable and substantive inference that their departure was an instinctive or impulsive reaction to a consciousness of guilt or was a deliberate effort to evade arrest and prosecution. Even though Adams and Franks later turned themselves in, the circumstances surrounding their departure supported a basis for admitting evidence of flight. Moreover, Adams' counter-explanation of their departure goes to weight of the evidence, not the evidence's admissibility. Accordingly, we hold that the trial court did not abuse its discretion in admitting evidence of flight.

## V.  CUMULATIVE ERROR

Adams argues that cumulative error deprived her of a fair trial under the cumulative error doctrine. We disagree.

We apply the cumulative error doctrine when a combination of trial errors denies the accused of a fair trial, "'even where any one of the errors, taken individually, would be harmless.'" *State v. Azevedo*, 31 Wn. App. 2d 70, 85, 547 P.3d 287 (2024) (quoting *In re Pers. Restraint of Cross*, 180 Wn.2d 664, 690, 327 P.3d 660 (2014)). Reversal is required if, under the totality of the circumstances, a defendant shows that the accumulation of errors substantially prejudiced them and denied them a fair trial. *Id*.

Here, as we concluded above, the trial court did not err in excluding the recordings of KA's and KC's interviews. When considering any harmless error for the trial court's exclusion of the transcript and even if we assume without deciding that an error occurred with admitting

Winegard's and Brothers' testimony, given the other evidence presented, we are not convinced that any errors substantially prejudiced Adams and denied her of a fair trial. Therefore, reversal under the cumulative error doctrine is not warranted.

## VI. EXCEPTIONAL SENTENCE

Adams argues that the trial court violated her Sixth and Fourteenth Amendment rights under the United States Constitution by imposing an exceptional sentence without the jury finding "substantial and compelling reasons" justifying the exceptional sentence. Br. of Appellant at 75. We disagree.

We review whether the imposition of an exceptional sentence violates a defendant's Sixth and Fourteenth Amendment rights de novo as it is a question of law. *State v. Alvarado*, 164 Wn.2d 556, 563, 192 P.3d 345 (2008). The Sixth Amendment provides, "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury. . . ." In conjunction with the due process clause of the Fourteenth Amendment, this Amendment gives a defendant the right to have every element of a crime proved to a jury beyond a reasonable doubt. *Hurst v. Florida*, 577 U.S. 92, 97, 136 S. Ct. 616, 193 L. Ed. 2d 504 (2016).

Under the Sentencing Reform Act (SRA), a trial court can impose an exceptional sentence—sentence outside of the standard range—if it determines that "there are substantial and compelling reasons justifying an exceptional sentence." RCW 9.94A.535.[14] Under RCW 9.94A.537(6), the exceptional sentence may be an aggravated sentence up to the maximum allowed by the SRA. Whenever the trial court imposes an exceptional sentence, "the court shall

---

[14] This statute was amended, effective July 27, 2025. However, we cite to the current version of the statute as the amendment did not change the portions relevant to the issue before us. *Compare* LAWS OF 2025, ch. 90, § 1, *with* LAWS OF 2019, ch. 219, §1.

set forth the reasons for its decision in written findings of fact and conclusions of law." RCW 9.94A.535.

If a defendant does not waive their right to a jury, facts supporting an aggravated sentence, other than a prior conviction, must be proved to a jury beyond a reasonable doubt and be found by that jury unanimously and by a special interrogatory. RCW 9.94A.535; RCW 9.94A.537; *Blakely v. Washington*, 542 U.S. 296, 301, 124 S. Ct. 2531, 159 L. Ed. 2d 403 (2004) ("'Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.'") (quoting *Apprendi v. New Jersey*, 530 U.S. 466, 490, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000)). Any fact that "'expose[s] the defendant to a greater punishment than that authorized by the jury's guilty verdict' is an 'element' that must be submitted to the jury." *Hurst*, 577 U.S. at 97 (alteration in original) (quoting *Apprendi*, 530 U.S. at 494).

Once the jury by special verdict makes the factual determination whether aggravating circumstances have been proved beyond a reasonable doubt, "[t]he trial court [is] left only with the legal conclusion of whether the facts alleged and found were sufficiently substantial and compelling to warrant an exceptional sentence." *State v. Sage*, 1 Wn. App. 2d 685, 708, 407 P.3d 359 (2017) (alternations in original) (quoting *State v. Suleiman*, 158 Wn.2d 280, 290-91, 143 P.3d 795 (2006)). Determinations that apply the law to facts already found by the jury are not factual findings but legal conclusions that do not require further consideration by the jury. *Id.* at 708-710.

Adams argues that the trial court violated her constitutional rights because the trial court imposed the exceptional sentence based on a finding that substantial and compelling reasons

justified the increased punishment. Adams contends that, like the Florida scheme at issue in *Hurst*, Washington's sentencing scheme under the SRA requires the trial court to find factually that "substantial and compelling reasons" exist before imposing an exceptional sentence. Br. of Appellant at 80-82. However, Adams' reliance on *Hurst* is misplaced.

*Hurst* addressed Florida's death penalty sentencing scheme for capital felonies. 577 U.S. at 95-96. In their scheme, the jury provided an "advisory sentence"—a life or death sentence without stating the factual basis for its recommendation. *Id*. Although the trial courts had to give great weight to the jury's recommendation, the trial court exercised independent judgment in considering whether aggravating or mitigating factors existed. *Id.* at 96. The United States Supreme Court held that this sentencing scheme was unconstitutional because it allowed judges, rather than juries, to independently determine whether aggravating circumstances existed so to impose a death sentence. *Id.* at 98-100.

Florida's sentencing scheme in *Hurst* is distinguishable from Washington's SRA. Unlike Florida's scheme, Washington's scheme requires the jury to first find the existence of aggravating factors beyond a reasonable doubt. RCW 9.94A.535; RCW 9.94A.537(6). Only after a jury makes those factual findings does a trial court then consider whether those factors are "substantial and compelling" to justify an exceptional sentence as a matter of law. RCW 9.94A.535; RCW 9.94A.537(6); *Sage*, 1 Wn. App. 2d at 708-709. In contrast to the judges in Florida's sentencing scheme, Washington judges do not determine the existence of aggravating factors when a defendant has not waived their right to a jury. Therefore, Adams' reliance on *Hurst* is misplaced.

Next, Adams asks us to depart from *Sage*, which Adams recognizes already rejected a similar argument to the one Adams raises on appeal. We decline to do so here. *Sage* argued that the trial court violated his constitutional right to a jury trial by imposing an exceptional sentence based on the trial court concluding that substantial and compelling reasons existed, justifying imposing the sentence. *Sage*, 1 Wn. App. 2d at 689, 707. Division One concluded that the trial court did not engage in prohibited fact finding and properly imposed an exceptional sentence after the jury returned special verdicts finding aggravating circumstances beyond a reasonable doubt. *Id.* at 710. Both our supreme court and the United States Supreme Court denied review/certiorari of *Sage*. 191 Wn.2d 1007 (2018); 586 U.S. 1197 (2019). And *Sage* relies on and quotes a controlling decision from our supreme court, *Suleiman*, which has also held that "whether a court's stated reasons are sufficiently substantial and compelling to support an exceptional sentence is a question of law." 158 Wn.2d at 290-91 & n.3; *Sage*,1 Wn. App. 2d at 708 & n. 80. Unless our supreme court reverses its prior holding, we will not ignore this precedent.

Here, the trial court complied with the statutory and constitutional requirements. By special verdicts, the jury found aggravating factors beyond a reasonable doubt for all four counts. Specifically, the jury found the existence of aggravating factors of deliberate cruelty, particular vulnerability, and abuse of trust for the crimes of homicide by abuse and second degree murder. RCW 9.94A.535(3)(a-b), (n). The jury also found the aggravating factor of abuse of trust for the two counts of criminal mistreatment. RCW 9.94A.535(3)(n). The trial court then determined that, based on these findings, "substantial and compelling reasons" justified imposing an exceptional sentence, as required by RCW 9.94A.535 and RCW 9.94A.437. As this

determination was a legal conclusion, the trial court could make it without violating Adams' constitutional rights. *Sage*, 1 Wn. App. 2d at 708.

Therefore, we hold the trial court did not violate Adams' constitutional rights in its imposition of an exceptional sentence.

CONCLUSION

We hold (1) sufficient evidence supported Adams' homicide by abuse conviction, (2) the trial court did not violate Adams' right to present a defense in excluding the recordings of the interviews, (3) reversible error did not occur by the trial court's evidentiary decisions, (4) the cumulative error doctrine does not compel reversal, and (5) consistent with case law, the trial court did not violate Adams' constitutional rights in its imposition of an exceptional sentence. Accordingly, we affirm Adams' convictions and sentence.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Che, J.

We concur:

Glasgow, P.J.

Price, J.